**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

|  |  |  |
|---|---|---|
| **CAREFIRST OF MARYLAND, INC., GROUP HOSPITALIZATION AND MEDICAL SERVICES, INC., CAREFIRST BLUECHOICE, INC., BLUE CROSS AND BLUE SHIELD OF SOUTH CAROLINA, BLUECHOICE HEALTHPLAN OF SOUTH CAROLINA, INC., LOUISIANA HEALTH SERVICE & INDEMNITY COMPANY, D/B/A BLUE CROSS AND BLUE SHIELD OF LOUISIANA, and HMO LOUISIANA, INC.,** | ) ) ) ) ) ) ) ) ) ) ) ) | Case No. 1:22-cv-01362 *Consolidated with*: No: 1:20-cv-01853 (Master Case) No. 1:20-cv-01929 No. 1:20-cv-03332 No. 1:20-cv-04738 No. 1:20-cv-04940 |
| *Plaintiffs*, | ) ) |  |
| v. | ) ) |  |
| **WALGREEN CO. AND WALGREENS BOOTS ALLIANCE, INC.,** | ) ) ) ) |  |
| *Defendants*. | ) ) |  |

**DEFENDANTS' ANSWER AND AFFIRMATIVE DEFENSES**
**TO THE *CAREFIRST* PLAINTIFFS' COMPLAINT**

Defendants Walgreen Co. ("Walgreens") and Walgreens Boots Alliance, Inc. ("WBA," and together with Walgreens, "Defendants"), by their attorneys, hereby file this answer and affirmative defenses.

## DEFENDANTS' ANSWER

Defendants file this answer (the "Answer") in response to the Complaint, Dkt. 1 (the "Complaint") filed by Plaintiffs CareFirst of Maryland, Inc. ("CFMI"); Group Hospitalization and Medical Services, Inc. ("GHMSI"); CareFirst BlueChoice, Inc. ("CareFirst BlueChoice"); Blue Cross and Blue Shield of South Carolina ("BCBSSC"); BlueChoice HealthPlan of South Carolina, Inc. ("BCHPSC"); Louisiana Health Service & Indemnity Company d/b/a/ Blue Cross and Blue Shield of Louisiana ("BCBSLA"); and HMO Louisiana, Inc. ("HMOLA") (together, "Plaintiffs").

This Answer is made without waiving, but instead expressly reserving, all rights that Defendants may have to file dispositive motions or other responses addressing some or all of the allegations and claims asserted in the Complaint. To the extent that certain paragraphs of Plaintiffs' Complaint include footnotes, Defendants' Answer to each numbered paragraph referencing a footnote should be read to include Defendants' response to the footnote. This Answer includes the Complaint's headings for reference only; Defendants do not admit the truth of any allegations contained in, or any inference that could be drawn from, those headings. Except as expressly admitted herein, Defendants deny all allegations. Capitalized terms not otherwise defined in this Answer have the meanings ascribed to them in the Complaint. Defendants answer the Complaint's allegations as follows:

## I.    PRELIMINARY STATEMENT

**1.** For more than a decade, Walgreens—one of the largest retail drugstore chains in the United States—has knowingly and intentionally engaged in an ongoing fraudulent scheme to overcharge Plaintiffs for prescription drugs by submitting claims for payment at artificially inflated

prices. To conceal its scheme, Walgreens has made false statements and omitted material facts in connection with its **_true_** usual and customary ("U&C") prices—the payment ceiling generally defined as the cash price to a member of the general public paying for a prescription drug without insurance—for prescription drugs dispensed to individuals covered by Plaintiffs' health plans. Walgreens fraudulently submitted inflated U&C prices on millions of claims reimbursed by Plaintiffs. Through its fraudulent scheme, Walgreens has overcharged Plaintiffs hundreds of millions of dollars for prescription drugs.

**ANSWER**: Defendants admit that Walgreens is one of the largest retail drugstore chains in the United States; Defendants deny that WBA is a retail drugstore chain. Defendants admit that Walgreens has submitted usual and customary ("U&C") prices; Defendants deny that WBA has ever submitted U&C prices to any pharmacy benefit manager ("PBM") or public or private insurance plan. Defendants specifically deny that they engaged in a fraudulent scheme as alleged in the Complaint. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

2.     Significantly, on January 15, 2019, Walgreens settled claims brought by the United States, 39 states, and the District of Columbia alleging that, from January 2008 through December 2017, Walgreens violated the False Claims Act, 31 U.S.C. § 3729, et seq., by submitting false U&C prices that were higher than the prices it charged for the same drugs sold through its Prescription Savings Club cash discount program ("PSC Program"), thereby obtaining more money in reimbursements for Medicaid fee-for-service claims than it was entitled to receive.[1] Walgreens has now admitted—for the first time—that "in submitting claims for reimbursement,"

---

[1] *U.S. ex rel. Baker v. Walgreens, Inc. and Walgreen Co.*, No. 12 Civ. 00300-JPO, Stipulation and Order of Settlement and Dismissal ¶ 2(e) (S.D.N.Y. docket filed Jan. 24, 2019) (ECF No. 53) (hereinafter "Walgreens' DOJ Settlement").

Walgreens "did not identify its PSC program prices as its U&C prices for drugs on the PSC program formulary," despite being so required.[2] Walgreens further admitted—for the first time— facts demonstrating that the PSC Program itself was a sham, including that it "offered a savings guarantee pursuant to which PSC program members could recoup (in the form of store credit) the difference between the amount they paid to enroll in the program in a given year and the amount they received in discounted savings under the program in that year."[3] Plaintiffs similarly have been damaged by the same fraudulent course of conduct, as described and admitted to by Walgreens in the Walgreens' DOJ Settlement.

**ANSWER**: Defendants admit that, on December 14, 2018, Walgreens signed a Stipulation and Order of Settlement and Dismissal, which was entered by the United States District Court for the Southern District of New York on January 15, 2019, and filed on the public docket on January 24, 2019, to resolve claims related to the definition of U&C price in certain states' Medicaid regulations and related guidance. WBA denies that it was a party to the suit or settlement. Defendants respectfully refer the Court to the Stipulation and Order of Settlement and Release, *U.S. ex rel. Baker v. Walgreen Co.*, No. 12-cv-0300, Dkt. 53 (S.D.N.Y. Jan. 24, 2019), for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants specifically deny that they engaged in a fraudulent scheme as alleged in the Complaint and that the PSC Program was a sham. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

3.    Plaintiffs are health care plans offering comprehensive health care services and coverage, including prescription drug coverage, to their members residing in Maryland, Virginia, the District of Columbia, South Carolina, Louisiana, and other states in which they operate.  When

---

[2] *Id.*
[3] *Id.*

plan members fill prescriptions covered by Plaintiffs at a Walgreens pharmacy, Walgreens submits electronic claims to Plaintiffs for reimbursement for those prescriptions (through Plaintiffs' contracted pharmacy benefit managers ("PBMs")). In submitting electronic claims for payment, Walgreens is required to truthfully and accurately submit its U&C price for each dispensing event, in accordance with, *inter alia*, the National Council for Prescription Drug Program ("NCPDP")[4] requirements.

**ANSWER**: Defendants admit that Plaintiffs are health care plans that offer health care services and coverage, including prescription drug coverage, to their members. Defendants lack knowledge or information sufficient to form a belief as to whether Plaintiffs' health care services are "comprehensive" and as to where Plaintiffs provide health care services. Defendants admit that, when Plaintiffs' insureds fill prescriptions at a Walgreens pharmacy, Walgreens submits electronic reimbursement claims to Plaintiffs' designated PBMs. Defendants deny that WBA operates any pharmacies, submits any claims for reimbursement, or is required to or does submit U&C prices to any PBM or public or private insurance plan. Defendants respectfully refer the Court to the National Council for Prescription Drug Program ("NCPDP") requirements for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants lack knowledge or information sufficient to form a belief as to the contents of the other unspecified requirements referenced in the last sentence of Paragraph 3. Defendants admit that NCPDP is a non-profit organization that publishes certain guidelines for the electronic transmission of pharmacy reimbursement claims. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

---

[4] NCPDP is an accredited, non-profit organization that maintains the industry standard for electronic transmission and adjudication of pharmacy claims.

4.     Plaintiffs calculate the drug price to be paid to the pharmacy based on whether the U&C reported by Walgreens for a particular drug is less than or greater than the price that has been otherwise negotiated for that drug.  The U&C price functions as a reimbursement ceiling, ensuring that health plans do not pay Walgreens more than what Walgreens charges cash-paying customers paying without insurance.  This payment methodology is consistent across government standards, PBM instructions manuals, and decades-long industry practice, which recognize that reimbursements are to be adjudicated under this formula.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to whether or how Plaintiffs calculate drug prices paid to pharmacies or as to the function (if any) that the U&C price plays in any such price calculations. Defendants admit that some contracts between Walgreens and PBMs provide that the PBM will reimburse Walgreens at amounts equal to the lowest of various negotiated contract rates, Walgreens' U&C price, and certain other price points. Defendants specifically deny the last sentence of this paragraph. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

5.     In 2006, "big box" retailers like Walmart, Target, and Costco disrupted the retail pharmacy market by offering deeply discounted generic drugs—$4 for 30-day supplies—to their customers while also giving third-party payors, including Plaintiffs, the benefit of that deal by reporting their discount prices as their U&C prices for the same drugs, consistent with NCPDP and industry standards.  Federal health regulators at the Centers for Medicare and Medicaid Services ("CMS") also made clear that generic discount program prices were to be considered the pharmacy's U&C prices for the purposes of billing government healthcare programs.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to Costco's historical pricing practices. Defendants admit that, in 2006, Walmart and Target each announced that they would charge any customer $4 for a 30-day supply of certain specified generic drugs. On information and belief, Defendants admit that, because Walmart and Target charge the reduced prices to anyone who purchases generic drugs covered by the programs, without requiring enrollment in a membership program or the payment of a membership fee, among other things, the reduced prices are the pharmacies' retail prices and, therefore, properly submitted to PBMs as the pharmacies' U&C prices. Defendants lack knowledge or information sufficient to form a belief as to what Walmart or Target report as U&C prices to the PBMs representing Plaintiffs or other third-party payors, or whether Walmart and Target report U&C prices to Plaintiffs and other third-party payors at all. Defendants admit that the Centers for Medicare and Medicaid Services ("CMS") issued guidance to Part D Plan Sponsors on October 11, 2006, regarding the $4 discounted prices some pharmacies were offering on certain generic prescriptions. Defendants deny that this guidance applied to all pharmacies and all discount programs. Defendants respectfully refer the Court to the CMS guidance for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

6.     Walgreens recognized the need to retain and attract new customers, but—unlike the "big box" retailers—decided not to absorb substantially reduced margins in connection with lowering its U&C prices submitted to third-party payors, including Plaintiffs.  Concerned with maintaining its massive pharmacy revenue, which historically accounts for a vast majority of Walgreens' total revenue, and at the same time competing with "big box" retailers and other

pharmacies for in-store traffic and cash sales, Walgreens developed and carried out a massive fraud that resulted in substantial financial harm to Plaintiffs.

**ANSWER**:  Defendants admit that Walgreens generally endeavors to retain existing patients and attract new patients, but Defendants lack knowledge or information sufficient to form a belief as to the decisions "big box" retailers made about their margins and as to what U&C prices (if any) "big box" retailers submitted to PBMs representing third-party payors, including Plaintiffs. Defendants deny the remaining allegations in the first sentence of this paragraph. Defendants admit that Walgreens' pharmacy revenue historically accounts for approximately three quarters of its total revenue and that Walgreens faces competition from "big box" retailers and other pharmacies. Defendants deny the remaining allegations in the second sentence of this paragraph, and Defendants specifically deny that they engaged in a fraudulent scheme as alleged in the Complaint. Defendants deny that WBA served or serves any patients. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

7.      In or around 2007, Walgreens created the PSC Program to maintain its margins on brand and generic drugs by systematically overcharging Plaintiffs for prescription drugs dispensed to their members. Walgreens created the PSC Program for two reasons: first, to maintain and increase its market share for cash customers by offering deep discounts on prescription drugs, and second—and more importantly—to obfuscate its true U&C prices from third-party payors, including Plaintiffs. Walgreens artificially divided its cash business, which formerly consisted solely of customers who pay cash, into two segments: customers who pay the high cash price (which it would include in its U&C price) and customers who pay the low cash price (i.e., the price offered by the PSC Program or other similar programs, which would be excluded from U&C). In

short, Walgreens created the PSC Program in a covert attempt to insulate its high U&C prices by artificially dividing its customer base in a way that would undermine the central purpose of any health insurance company's prescription drug benefit—that Plaintiffs do not pay more than what cash customers pay for the same drugs.

**ANSWER**:  Defendants admit that, in or around 2007, Walgreens launched pilots of the PSC Program, which used a formulary that allowed members who took affirmative steps to join to obtain certain prescription medicines at lower prices. Such affirmative steps include, among other things, enrolling in the program, agreeing to abide by the program's terms and conditions, consenting to Walgreens' use of the customer's personal health and other information, and paying a membership fee. Defendants further admit that Walgreens launched the PSC Program nationwide in or around August 2008. Defendants deny that patients who fill prescriptions through the PSC Program are "cash customers," as that term is used in Walgreens' PBM contracts and industry parlance. Defendants further deny that WBA created the PSC Program or serves any patients. Defendants further deny that they engaged in a fraudulent scheme as alleged in the Complaint. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

8.      But unbeknownst to Plaintiffs, Walgreens submitted U&C prices that were regularly five, ten, or even twenty times higher than what Walgreens actually charged cash customers through its PSC Program (and other programs).  Still, on its claims for reimbursement to Plaintiffs, Walgreens reported those artificially inflated "U&C" prices, which were neither usual nor customary, as its U&C prices.  By submitting false and inflated U&C prices to Plaintiffs, Walgreens knowingly and wrongfully overcharged Plaintiffs on millions of claims.

**ANSWER**:  Defendants deny that PSC members who fill prescriptions through the PSC Program are "cash customers," as that term is used in Walgreens' PBM contracts and industry parlance. Defendants further deny that Walgreens submitted any U&C prices or claims for reimbursement to Plaintiffs. Defendants further deny that WBA ever submitted a U&C price to any PBM or public or private third-party payor. Defendants further deny that they engaged in a fraudulent scheme as alleged in the Complaint. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

9.      Walgreens knowingly and intentionally concealed from Plaintiffs the ***actual*** cash prices offered to members of the general public paying without insurance—*i.e.*, Walgreens' ***true*** U&C prices—on both brand and generic prescription drugs.  To conceal its fraudulent scheme, Walgreens knowingly made false statements and omitted material facts in connection with its true U&C prices, including, but not limited to, the scope of PSC Program membership; PSC Program eligibility; the enrollment process; the enrollment "fee"; and frequency, share, number, and other key data points related to Walgreens' cash sales under the PSC Program and other similar discount programs; and other discounts (not associated with a discount program) offered to the individuals paying without insurance for drugs also dispensed to Plaintiffs' Members.

**ANSWER**:  Defendants deny that PSC members who fill prescriptions through the PSC Program are "cash customers," as that term is used in Walgreens' PBM contracts and industry parlance. Defendants further deny that Walgreens made any statements to Plaintiffs regarding the PSC Program or Walgreens' U&C prices. Defendants further deny that WBA ever sold any prescription drugs to anyone and that WBA ever submitted a U&C price to any PBM or public or private third-party payor. Defendants further deny that they engaged in a fraudulent scheme as

alleged in the Complaint. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

10. For example, Walgreens also effectuated this fraud by offering a prescription savings club called "JustRx" ("JustRx Program") to customers at more than 1,900 Walgreens-owned Rite Aid-branded pharmacy locations and at Walgreens and Duane Reade pharmacy locations and failing to report these prices as U&C. Additionally, Walgreens further effectuated this fraud by charging third-party branded discount card prices to individuals who pay without insurance, *e.g.*, RxSaver and GoodRx ("third-party discount card programs") and, similarly, failing to report these prices as U&C.

**ANSWER**: Defendants deny that they own, operate, or control the JustRx Program, RxSaver, GoodRx, and any other "third-party discount card programs." Defendants further deny that patients who fill prescriptions through the JustRx Program, RxSaver, GoodRx, and other "third-party discount card programs" are "cash customers," as that term is used in Walgreens' PBM contracts and industry parlance. Defendants further deny that WBA ever provided any patient with benefits under any prescription savings clubs, third-party discount cards, or other third-party discounts. Defendants further deny that WBA ever sold any prescription drugs to anyone and that WBA ever submitted a U&C price to any PBM or public or private third-party payor. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

11. As a result of Walgreens' fraudulent scheme, Walgreens has substantially overcharged Plaintiffs for prescription drugs purchased by their Members at Walgreens' pharmacies. Plaintiffs reimbursed Walgreens for their Members' brand and generic prescription

drugs based on Walgreens' inflated U&C prices and, as a result, Plaintiffs were overcharged millions of dollars.

**ANSWER**: Defendants deny that Walgreens directly charged Plaintiffs for prescription drugs purchased at Walgreens' pharmacies. Defendants further deny that WBA ever sold any prescription drugs to anyone and that WBA ever submitted a U&C price to any PBM or public or private third-party payor. Defendants further deny that they engaged in a fraudulent scheme as alleged in the Complaint. Defendants lack knowledge or information sufficient to form a belief as to what role (if any) U&C prices play in Plaintiffs' reimbursement payments to their PBMs. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

## II.     **THE PARTIES**

### A.      **Plaintiffs**

**12.**     Plaintiff CFMI is a not for profit corporation organized under the laws of Maryland with its principal place of business in Baltimore, Maryland. CFMI operates as a nonprofit health services plan in Maryland.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

**13.**     Plaintiff GHMSI is a congressionally chartered corporation with its principal place of business in Washington, D.C. GHMSI operates as a not for profit health services plan in two counties of Maryland, Northern Virginia, and the District of Columbia.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

**14.**     Plaintiff CareFirst BlueChoice is a corporation organized under the laws of the District of Columbia with its principal place of business in Washington, D.C. CareFirst

BlueChoice operates as a health services plan in Maryland, Northern Virginia, and the District of Columbia.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

15.    Plaintiff BCBSSC is a mutual insurance company organized under the laws of South Carolina with its principal place of business in Columbia, South Carolina.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

16.    Plaintiff BCHPSC is a wholly owned subsidiary of BCBSSC and a corporation organized under the laws of South Carolina with its principal place of business in Columbia, South Carolina.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

17.    BCBSLA is a Louisiana domestic health insurance corporation organized under the laws of Louisiana with its principal place of business in Baton Rouge. BCBSLA provides and manages health benefits to more than 1 million insureds and members throughout the United States. BCBSLA also provides third-party administrative services for insured and members.

**ANSWER**:  Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

18.    HMOLA is a wholly owned subsidiary of BCBSLA and a Louisiana domestic health maintenance corporation organized under the laws of Louisiana with its principal place of business in Baton Rouge, Louisiana. HMOLA provides and manages health benefits to insureds and members throughout the United States.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to the truth or falsity of the allegations in this Paragraph.

### B. Defendants

19. Defendant Walgreen Co. ("Walgreen Co.") is an Illinois corporation that maintains its corporate headquarters at 200 Wilmot Road in Deerfield, Illinois 60015. Until December 31, 2014, Walgreen Co. had no corporate parent. On December 31, 2014, Walgreen Co. became a wholly-owned subsidiary of Defendant Walgreens Boots Alliance, Inc. pursuant to a merger to affect a reorganization of Walgreen Co. into a holding company structure ("Reorganization"), with Walgreens Boots Alliance, Inc. becoming the parent holding company.[5]

**ANSWER**: Defendants admit the allegations in this Paragraph, except that to the extent this Paragraph purports to characterize or recite the contents of the Form 10-K cited in footnote 5, Defendants respectfully refer the Court to the Form 10-K for its true and complete contents, and Defendants deny any such purported characterizations or recitations inconsistent therewith.

20. Defendant Walgreens Boots Alliance, Inc. ("WBA") is a Delaware corporation with its principal place of business and corporate headquarters at 108 Wilmot Road in Deerfield, Illinois 60015. On December 31, 2014, WBA became the successor of Walgreen Co., pursuant to the Reorganization, with WBA becoming the direct parent holding company and Walgreen Co. becoming a wholly-owned subsidiary of WBA.[6]

**ANSWER**: Defendants admit the allegations in the first sentence of this Paragraph. Defendants further admit that, through the Reorganization, WBA became the direct parent holding

---

[5] Form 10-K for Fiscal Year ending 08/31/2018, WALGREENS BOOTS ALLIANCE, INC. (Oct. 11, 2018) ("WBA 2018 10-K"), at 1, *available at* https://www.sec.gov/Archives/edgar/data/1618921/000162828018012472/wba-2018831x10k.htm (accessed Aug. 10, 2020).
[6] *Id.*

company of Walgreens and Walgreens became a wholly owned subsidiary of WBA. To the extent this Paragraph purports to characterize or recite the contents of the Form 10-K cited in footnote 6, Defendants respectfully refer the Court to the Form 10-K for its true and complete contents, and Defendants deny any such purported characterizations or recitations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

21.     All WBA profits are derived from its wholly-owned operating subsidiaries, including Walgreen Co.  Because of their integrated operations, Walgreen Co. and WBA are referred to herein as "Walgreens."

**ANSWER**:  Defendants admit that, because WBA does not operate pharmacies, have any customers, or sell any products, WBA derives all of its profits from its wholly owned operating subsidiaries, including Walgreens. Defendants deny that Walgreens and WBA have or had "integrated operations." WBA specifically denies that it had any relationship with Walgreens before December 31, 2014. For purposes of this Answer, Defendants refer to Walgreen Co. as "Walgreens" and Walgreens Boots Alliance, Inc., as "WBA."

22.     During the course of the events alleged in this action, Walgreens operated under the trade name Walgreens or through various Walgreens-affiliated store banners across the United States, including but not limited to:  Duane Reade, Kerr Drug, Super D Drug, USA Drug, Happy Harry's, Med-X Drug, May's Drug, and Drug Warehouse (collectively, "Walgreens-affiliated banners").

**ANSWER**: Defendants admit that at various times Walgreens operated pharmacies under the trade names Walgreens, Duane Reade, Kerry Drug, Super D Drug, USA Drug, Happy Harry's, Med-X Drug, May's Drug, and Drug Warehouse. Defendants lack knowledge or information

sufficient to form a belief as to whether Walgreens operated under other unnamed store banners referenced in this Paragraph. Defendants deny that WBA operated any pharmacies under any trade names or banners. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

23.     Walgreens is one of the largest retail drugstore chains in the United States based on both revenues and number of stores.  Walgreens operates 9,277 retail pharmacies in all fifty states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, including 154 drugstores in Maryland, 14 drugstores in Washington, D.C., 150 drugstores in South Carolina, and 271 drugstores in Tennessee.[7]

**ANSWER**:  Defendants admit that Walgreens is one of the largest retail drugstore chains in the United States based on both revenue and number of stores; Defendants deny that WBA is a retail drugstore chain. Defendants admit that Walgreens operates approximately 9,000 drugstores located in all fifty states, the District of Columbia, Puerto Rico, and the U.S. Virgin Islands, including 154 drugstores in Maryland, 14 drugstores in Washington, D.C., 150 drugstores in South Carolina, and 271 drugstores in Tennessee, as of August 31, 2020. Defendants deny that WBA operates any drugstores in any state, commonwealth, district, or territory. To the extent this Paragraph purports to characterize or recite the contents of the Form 10-K and webpage cited in footnote 7, Defendants respectfully refer the Court to the Form 10-K and webpage for their true and complete contents, and Defendants deny any such purported characterizations or recitations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

---

[7] *Id.* at 3; *see also* "Store Count by State," WALGREENS (Aug. 31, 2020), *available at* https://news.walgreens.com/fact-sheets/store-count-by-state.htm (accessed Feb. 2, 2020).

24.     In September 2017, Walgreens announced that it had secured regulatory clearance to purchase 1,932 Rite Aid pharmacy stores "located primarily in the Northeast and Southern U.S." for approximately $4.2 billion.[8] By March 27, 2018, Rite Aid completed the transfer of all 1,932 stores to Walgreens,[9] and Walgreens now publicly identifies those locations as "Walgreens-owned Rite Aid stores."[10]

**ANSWER**: Defendants admit that, in September 2017, WBA announced that it had secured regulatory clearance to purchase approximately 1,900 Rite Aid stores. Defendants admit that, as of March 27, 2018, Rite Aid had transferred approximately 1,900 stores to WBA. To the extent this Paragraph purports to characterize or recite the contents of the Form 10-K and press releases cited in footnotes 8, 9, and 10, Defendants respectfully refer the Court to the cited documents for their true and complete contents, and Defendants deny any such purported characterizations or recitations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

25.     In fiscal year 2019, Walgreens' U.S. retail pharmacies filled 843.7 million prescriptions (including immunizations). In fiscal year 2019, Walgreens' U.S. retail pharmacy sales revenue exceeded $104.5 billion.[11]

---

[8] WBA 2018 10-K at 72; *see also* "Walgreens Boots Alliance Secures Regulatory Clearance for Purchase of Stores and Related Assets from Rite Aid," WALGREENS BOOTS ALLIANCE, INC. (Sept. 17, 2017), *available at* https://www.walgreensbootsalliance.com/news-media/press-releases/2017/walgreens-boots-alliance-secures-regulatory-clearance-purchase (accessed Aug. 10, 2020).

[9] "Rite Aid Completes Transfer of Stores to Walgreens Boots Alliance and Terminates Tax Benefits Preservation Plan," RITE AID CORP. (Mar. 28, 2018), *available at* https://www.riteaid.com/corporate/news/-/pressreleases/news-room/2018/rite-aid-completes-transfer-of-stores-to-walgreens-boots-alliance-and-terminates-tax-benefits-preservation-plan (accessed Aug. 10, 2020).

[10] *See* "Welcome Rite Aid Pharmacy Patients," WALGREENS, *available at* https://www.walgreens.com/topic/pharmacy/welcome_rite_aid.jsp (accessed Aug. 10, 2020).

[11] Form 10-K for Fiscal Year ending 08/31/2019, WALGREENS BOOTS ALLIANCE, INC. (Oct. 28, 2019) ("WBA 2019 10-K"), at 4, *available at*

**ANSWER**:  Defendants admit that, in fiscal year 2019, Walgreens' U.S. retail pharmacies filled 843.7 million prescriptions (including immunizations). Defendants admit that, in fiscal year 2019, Walgreens' U.S. retail pharmacy sales revenue was $104.5 billion. Defendants deny that, in fiscal year 2019, WBA filled any prescriptions. Defendants deny that, in fiscal year 2019, WBA sold any products at retail pharmacies. To the extent this Paragraph purports to characterize or recite the contents of the Form 10-K cited in footnote 11, Defendants respectfully refer the Court to the Form 10-K for its true and complete contents, and Defendants deny any such purported characterizations or recitations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

26.    Walgreens refers to itself as "the largest retail pharmacy, health and daily living destination across the United States and Europe."[12] Approximately 78 percent of the U.S. population lives within five miles of a Walgreens retail pharmacy location.[13]

**ANSWER**:  Defendants respectfully refer the Court to the Form 10-K cited in footnotes 12 and 13 for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants specifically deny that approximately 78 percent of the U.S. population lives within five miles of a Walgreens retail pharmacy location. Defendants deny that WBA has any pharmacy locations. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

27.    At all relevant times, Walgreens is and has been a network pharmacy for Plaintiffs, meaning that Plaintiffs' Members can use their prescription drug benefit to fill their prescriptions

---

https://www.sec.gov/Archives/edgar/data/1618921/000161892119000069/wba-2019831x10k.htm (accessed Aug. 10, 2020).
[12] *Id.* at 1.
[13] *Id.* at 4.

at Walgreens pharmacy locations at in-network pricing. When a Walgreens pharmacy dispenses a prescription to a Member, Walgreens causes an electronic claim for reimbursement to be sent to Plaintiffs' PBM, which then submits a claim for payment to Plaintiffs. During the relevant time period, Plaintiffs have paid Walgreens through PBMs.

**ANSWER**:  Defendants admit that Walgreens is and has been a member of pharmacy networks administered by Plaintiffs' PBMs and that, as a result, Plaintiffs' members receive and have received in-network pricing when filling prescriptions at Walgreens pharmacies. Defendants deny that WBA is a pharmacy or was a network pharmacy for Plaintiffs or their PBMs at any time. Defendants admit that when a Walgreens pharmacy dispenses a prescription to a Plaintiff's insured, the Walgreens pharmacy sends an electronic claim for reimbursement to the given Plaintiff's PBM. Defendants lack knowledge or information sufficient to form a belief as to what information, if any, Plaintiffs' PBMs submit to Plaintiffs. Defendants deny that WBA dispenses prescriptions or submits any claims for reimbursement. Defendants admit that Walgreens receives reimbursement payments from PBMs for prescriptions filled at Walgreens pharmacies by Plaintiffs' insureds. Defendants deny that PBMs or Plaintiffs pay any amounts to WBA. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

28. Walgreens is a defendant in six related actions pending in this Court. On March 23, 2017, a putative nationwide class of third-party payors and insured consumers filed a complaint in *Forth, et al. v. Walgreen Co. and Walgreens Boots Alliance, Inc.*, Civ. No. 17-cv-02246, ECF No. 1 (N.D. Ill.) (Lee, J.). The allegations in the *Forth* complaint share a similar factual and legal nexus to Plaintiffs' allegations here; for example, that Walgreens "used its PSC [Program] as a mechanism to knowingly and intentionally overcharge consumers and third-party payors . . . in

excess of Walgreens' actual U&C prices" for drugs discounted by Walgreens' retail drug programs. *Id.* ¶ 6. On March 18, 2020, a complaint was filed in *BCBSM, Inc. (d/b/a Blue Cross and Blue Shield of Minnesota), et al. v. Walgreen Co., et al.*, Civ. Case No. 1:20-cv-01853, ECF No. 1 (N.D. Ill.) (Kendall, J.). On June 5, 2020, a complaint was filed in *Horizon Healthcare Services, Inc. (d/b/a Horizon Blue Cross Blue Shield of New Jersey), et al. v. Walgreen Co., et al.*, Civ. Case No. 1:20-cv-03332, ECF No. 1 (N.D. Ill.), (Kendall, J.). On June 15, 2020, an amended complaint was filed in *HealthNow New York Inc., et al. v. Walgreen Co., et al.*, Civ. Case No. 1:20-cv-1929, ECF No. 33 (N.D. Ill.), (Kendall, J.). On August 12, 2020, a complaint was filed in *Blue Cross and Blue Shield of Arizona, Inc. (d/b/a Blue Cross Blue Shield of Arizona and d/b/a AZBlue) v. Walgreen Co., et al.*, Civ. Case No. 1:20-cv-04738, ECF No. 1 (N.D. Ill.). On August 21, a complaint was filed in *Asuris Northwest Health et al. v. Walgreen Co. et al.*, Civ. Case No. 1:20-cv-04940, ECF No. 1 (N.D. Ill.). On January 28, 2021, the Plaintiffs in the *BCBSM*, *Horizon*, *HealthNow*, *Blue Cross and Blue Shield of Arizona*, and *Asuris Northwest Health et al.* actions filed a consolidated First Amended Complaint. The allegations in the First Amended Complaint shares a similar factual and legal nexus to Plaintiffs' allegations here, including, *inter alia*, Defendants' fraudulent misrepresentation of the usual and customary prices of prescription drugs dispensed by Defendants' pharmacies.

**ANSWER**: Defendants admit that Walgreens is a defendant in *Forth v. Walgreen Co.*, No. 17-cv-2246 (N.D. Ill.) ("*Forth*"). Defendants admit that the *Forth* complaint alleges the same fraud scheme and contains many of the same factual allegations, legal theories, and claims as the Complaint, and that the *Forth* complaint's allegations also concern the PSC Program's alleged effect on Walgreens' U&C prices. Defendants respectfully refer the Court to the *Forth* complaint for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

Defendants admit that Walgreens is a defendant in *BCBSM, Inc. (d/b/a Blue Cross and Blue Shield of Minnesota), et al. v. Walgreen Co., et al.*, Civ. Case No. 1:20-cv-01853, ECF No. 1 (N.D. Ill.), and in the other related matters with which that case has been consolidated: namely, *Horizon Healthcare Services, Inc. (d/b/a Horizon Blue Cross Blue Shield of New Jersey), et al. v. Walgreen Co., et al.*, Civ. Case No. 1:20-cv-03332, ECF No. 1 (N.D. Ill.); *HealthNow New York Inc., et al. v. Walgreen Co., et al.*, Civ. Case No. 1:20-cv-1929, ECF No. 33 (N.D. Ill.); *Blue Cross and Blue Shield of Arizona, Inc. (d/b/a Blue Cross Blue Shield of Arizona and d/b/a AZBlue) v. Walgreen Co., et al.*, Civ. Case No. 1:20-cv-04738, ECF No. 1 (N.D. Ill.); and *Asuris Northwest Health et al. v. Walgreen Co. et al.*, Civ. Case No. 1:20-cv-04940, ECF No. 1 (N.D. Ill.). Defendants admit that the plaintiffs in these consolidated matters assert substantially the same factual allegations, legal theories, and claims as the Complaint, and that the plaintiffs' allegations and claims also concern the PSC Program's alleged effect on Walgreens' U&C prices. Defendants respectfully refer the Court to the First Amended Complaint referenced in Paragraph 28 and to the operative, consolidated Second Amended Complaint in *BCBSM, Inc. (d/b/a Blue Cross and Blue Shield of Minnesota), et al. v. Walgreen Co., et al.*, No. 1:20-cv-01853, and the other matters with which that case has been consolidated, for those pleadings' true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

## III.   JURISDICTION AND VENUE

### A.   Jurisdiction

29.    This Court has subject matter jurisdiction pursuant to 28 U.S.C. §§ 1332 and 1367 because Plaintiffs are citizens of Maryland, Washington, D.C., South Carolina, and Louisiana; the Defendants are citizens of Delaware and Illinois; and the amount in controversy exceeds $75,000.

**ANSWER**:  Defendants admit that Walgreens is an Illinois corporation with its corporate headquarters in Illinois. Defendants admit that WBA is a Delaware corporation with its corporate headquarters in Illinois. Defendants admit that no Plaintiff claims to be a citizen of Illinois. Defendants lack knowledge or information sufficient to form a belief as to the citizenship of each Plaintiff. Defendants admit that the Complaint purports to seek alleged damages in excess of $75,000. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

**30.**     This Court has general personal jurisdiction over Defendants because Defendants maintain their principal places of business at 108 Wilmot Road and 200 Wilmot Road, both in Deerfield, Illinois, which is located within the Northern District of Illinois.

**ANSWER**:  Defendants admit that Walgreens maintains its corporate headquarters at 200 Wilmot Road, Deerfield, Illinois. Defendants admit that WBA maintains its corporate headquarters at 108 Wilmot Road, Deerfield, Illinois. Defendants admit that this Court has personal jurisdiction over Defendants for purposes of these consolidated actions. Defendants admit that Deerfield is located within the Northern District of Illinois. Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

**B.     Venue**

**31.**     Venue is proper in the United States District Court for the Northern District of Illinois (Eastern Division) pursuant to 28 U.S.C. §§1391(b-d) because, *inter alia*, both Defendants reside in, and are subject to personal jurisdiction in, this District at the time Plaintiffs commenced this action and because Defendants' contacts within this District are significant and sufficient to subject them to personal jurisdiction.  Further, venue is appropriate in this District because a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District.

**ANSWER**: Defendants admit that venue is proper in the United States District Court for the Northern District of Illinois (Eastern Division) and that this Court has personal jurisdiction over Defendants for purposes of these consolidated actions. Defendants specifically deny that a substantial part of the events or omissions giving rise to Plaintiffs' claims occurred in this District. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

## IV.   FACTS APPLICABLE TO ALL CLAIMS

### A.   U&C Is The Price Paid By Customers Without Insurance.

32.     U&C is the price customers without insurance pay a given pharmacy for prescription drugs, i.e., the cash or uninsured price. Per the "lesser of" reimbursement formulation, it also serves as a ceiling to how much a pharmacy can charge a health plan (like Plaintiffs) for the drug.

**ANSWER**:  Defendants admit that some contracts between Walgreens and PBMs provide that the PBM will reimburse Walgreens at amounts equal to the lowest of various negotiated contract rates, Walgreens' U&C price, and certain other price points. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

33.     Industry organizations endorse this definition.  The Academy of Managed Care Pharmacy ("AMCP")[14] *Guide to Pharmaceutical Payment Methods* (October 2007) defines U&C as "the price for a given drug or service that a pharmacy or other provider would charge a cash-paying customer without the benefit of insurance provided through a payer or intermediary with a contract with the provider."  The NCPDP standards define the U&C price as the "[a]mount charged

---

[14] AMCP is an industry-wide organization whose membership includes both health systems and PBMs.

cash paying customers for the prescription exclusive of sales tax or other amounts claimed."[15]  The U&C price, the NCPDP standards explain, "represents the value that a pharmacist is willing to accept as their total reimbursement for dispensing the product/service to a cash-paying customer."[16]

**ANSWER**:  Defendants admit that the AMCP is a professional association that includes health systems and PBMs as members. Defendants respectfully refer the Court to the alleged publications referenced in this Paragraph for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants specifically deny that Paragraph 33 accurately quotes the definition of U&C included in the AMCP Guide to Pharmaceutical Payment Methods from October 2007. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

34.     For over a decade, federal health programs have consistently required the cash prices offered by pharmacy discount programs to be reported as a pharmacy's U&C prices. These government rules, regulations, and guidance include:

     a.     **CMS Guidance to Medicare Part D Sponsors.** CMS published a memo in 2006 that explained: "Wal-Mart recently introduced a program offering a reduced price for certain generics to its customers. The low Wal-Mart price on these specific generic drugs is considered Wal-Mart's 'usual and customary' price, and is not considered a one-

---

[15] *See NCPDP Reference Manual*, Ch. 3 at 72 (rev. Oct. 2005), *available at* https://www.cms.gov/Medicare/Billing/ElectronicBillingEDITrans/downloads/NCPDPflatfile.pdf (accessed Aug. 10, 2020).
[16] *See Telecommunications Version 5*, NCPDP, at 38 (Feb. 2010), *available at* https://ncpdp.org/members/pdf/Version_5_questions_v35.pdf (accessed Mar. 12, 2020).

time 'lower cash' price. Part D sponsors consider this lower amount to be 'usual and customary' and will reimburse Wal-Mart on the basis of this price."[17]

b.    **Medicare Part D Regulations.** U&C price is defined as "the price that an out-of-network pharmacy or a physician's office **charges a customer who does not have any form of prescription drug coverage** for a covered Part D drug."[18]

c.    **Medicare Prescription Drug Benefit Manual.** U&C price is defined as "the price that an out-of-network pharmacy or a physician's office **charges a customer who does not have any form of prescription drug coverage** for a covered Part D drug."[19]

d.    **TRICARE Pharmacy Manuals**. The pharmacy manual for TRICARE, the health care program for uniformed service members, retirees, and their families, defines U&C price to include "loss leaders, frequent shopper or special customer discounts or programs, competitor's matched price or any and all other discounts, special promotions, and programs causing a reduction in the price offered to that Member . . . Additionally, the Usual and Customary Retail Price must include any applicable discounts offered to attract customers "[20]

e.    **Federal Employees Health Benefits Plan Pharmacy Manuals**. The FEHBP pharmacy manual defines U&C as "**the lowest price Provider would charge a particular patient if such patient were paying cash** for an identical prescription on that

---

[17] *HPMS Q&A – Lower Cash Price Policy*, Memorandum to All Part D Sponsors, Centers for Medicare & Medicaid Services, at 1 (Oct. 11, 2006).
[18] 42 C.F.R. § 423.100 (emphasis added); *see also* 42 C.F.R. §423.160 (incorporating NCPDP standards into the Medicare Part D program).
[19] *See* ch. 5, § 10.2, Benefits and Beneficiary Protections (rev. 9/20/2011) (emphasis added).
[20] *TRICARE Express Scripts Pharmacy Manual* (2013).

particular day at that particular location.  This price must include any applicable discounts offered to attract patients."[21]

    f. **Walgreens PBM—Walgreens Health Initiative.** Walgreens Health Initiative ("WHI") was a wholly-owned PBM subsidiary of Walgreen Co. until WHI was acquired by Catalyst Health Solutions in 2011.  WHI's Pharmacy Manual defines U&C as "the cash price including all applicable discounts, coupons or sale price which a cash-paying customer would pay at the pharmacy."[22]  In addition, WHI directed its own network pharmacies to use the standard NCPDP form containing the "usual and customary" field discussed above.

**ANSWER**:  Defendants admit that CMS issued guidance to Part D Plan Sponsors on October 11, 2006, regarding the lower cash prices some pharmacies were offering on generic prescriptions. Defendants admit the guidance contains the language quoted in Paragraph 34(a). Defendants admit that 42 C.F.R. § 423.100's definition of "usual and customary price" contains the language quoted in Paragraph 34(b). Defendants deny the remaining allegations in Paragraph 34(b), except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions. Defendants admit that the definition of "Usual and customary (U&C) price" from Medicare's Prescription Drug Benefit Manual, as amended on September 20, 2011, contains the language quoted in Paragraph 34(c). Defendants admit that TRICARE is the health care program for uniformed U.S. service members, retirees, and their families. Defendants respectfully refer the Court to the TRICARE Express Scripts 2013 Pharmacy Manual referenced in Paragraph 34(d) for its true and complete contents, and Defendants deny any allegations inconsistent therewith.

---

[21] *FEHBP CVS/Caremark Manual* (2009) (emphasis added).
[22] Pharmacy Manual, WALGREENS HEALTH INITIATIVES, INC., 25 (Jan. 2011), *available at* http://www.walgreenshealth.com/pdf/forms/Revised_Pharmacy_Manual_2010_Revised_04072010.pdf (accessed Aug. 10, 2020).

Defendants respectfully refer the Court to the pharmacy manual referenced in Paragraph 34(e) for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants admit that WHI was a wholly-owned subsidiary of Walgreens until WHI was acquired by Catalyst Health Solutions Inc. in 2011. Defendants admit that WHI was a PBM. Defendants deny that WBA ever held any interest in WHI. Defendants respectfully refer the Court to the WHI pharmacy manual referenced in this Paragraph for the manual's true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants specifically deny that Paragraph 34(f) accurately quotes the definition of U&C price included in the WHI pharmacy manual dated January 2011. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

**35.** State Medicaid programs likewise require cash prices offered by pharmacy discount programs to be reported as a pharmacy's U&C prices. *See, e.g.*, Walgreens' DOJ Settlement.

**ANSWER**:  Defendants deny the allegations in Paragraph 35, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**36.** More specifically, Walgreens knew that the U&C prices for prescription drugs dispensed to Plaintiffs' Members must include prices that Walgreens charged to cash customers paying without insurance, including "discount" prices.

**ANSWER**:  Defendants admit that certain of Walgreens' contracts with certain PBMs defined U&C price as the price Walgreens charged cash customers, including certain discounts. Defendants deny that patients who fill prescriptions through the PSC Program, JustRx Program, RxSaver, GoodRx, and other third-party discount card programs are "cash customers," as that term is used in Walgreens' PBM contracts and industry parlance. Defendants deny that prices offered through the PSC Program, JustRx Program, RxSaver, GoodRx, and other third-party discount card

programs qualify as discounts for purposes of the U&C definitions in Walgreens' PBM contracts. Defendants further deny that WBA sold any prescription drugs or charged any drug prices to any customer. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

37.     At all relevant times, Walgreens knew that Plaintiffs contracted to receive the benefit of the prices that Walgreens charged to its customers who paid without insurance, including "discount" prices, in their reported U&C prices.

**ANSWER**:  Defendants respectfully refer the Court to the contracts between Plaintiffs and Plaintiffs' PBMs referenced in Paragraph 37 for the contracts' true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants further deny that WBA sold any prescription drugs, charged any drug prices to any customer, or entered into any agreements with Plaintiffs or their PBMs. Defendants deny the remaining allegations in this Paragraph, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

38.     Plaintiffs' contracts with their PBMs recognized and implemented the NCPDP requirements and industry standards for reporting U&C prices.

**ANSWER**:  Defendants respectfully refer the Court to the contracts between Plaintiffs and Plaintiffs' PBMs for the contracts' true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

39.     Furthermore, under a Participating Pharmacy Agreement and Amendments thereto, between Prime Therapeutics and Walgreens ("Walgreens Prime PPA"), Walgreens agreed to report its U&C charge on all claims submitted to Prime Therapeutics for payment by Plaintiffs, who contracted with Prime as their PBM.

**ANSWER**:  Defendants respectfully refer the Court to the contracts between Walgreens and Prime Therapeutics, LLC, for those contracts' true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny that WBA was ever a party to a Participating Pharmacy Agreement (or related amendments) with Prime and that WBA ever agreed to report U&C charges to Prime. Defendants deny the remaining allegations in this Paragraph, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

40.     The Walgreens Prime PPA required Walgreens to accept as payment the lesser of the U&C charge or a negotiated rate.

**ANSWER**: Defendants respectfully refer the Court to the contracts between Walgreens and Prime for those contracts' true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny that WBA was ever a party to a Participating Pharmacy Agreement or Amendments thereto with Prime and that WBA ever agreed to accept from Prime as payment the lesser of the U&C charge or a negotiated rate. Defendants deny the remaining allegations in this Paragraph, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

41.     On information and belief, the Walgreens Prime PPA[23] and other contracts between Plaintiffs' PBMs and Walgreens (in place at various times throughout the relevant time period) define U&C using the same or similar definition as the Plaintiffs' PBM agreements, and consistent with NCPDP requirements and industry standards.  The Walgreens Prime PPA and other PBM contracts require Walgreens to submit claims electronically or in writing using the industry standard NCPDP Universal Claims Form.

---

[23] The Walgreens Prime PPA contains a confidentiality provision preventing disclosure without both parties' consent. Prime Therapeutics consented to provide the Walgreens Prime PPA, and at Plaintiffs' request, Prime Therapeutics sought Walgreens' consent to provide the Walgreens Prime PPA to Plaintiffs. Walgreens, however, refused to consent.

**ANSWER**:  Defendants respectfully refer the Court to the contracts between Walgreens and its PBMs for those contracts' true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants specifically deny that Plaintiffs have a good faith basis to plead the allegations in Paragraph 41's first sentence "[o]n information and belief," now that Plaintiffs have seen the U&C definitions in Walgreens' contracts with, for example, Express Scripts, Inc., and Caremark, LLC and CaremarkPCS, LLC—definitions that expressly exclude PSC Program prices. Defendants further specifically deny that WBA was ever party to a pharmacy services agreement or similar contract with any PBM or that WBA submits any reimbursement claims to any PBM (electronically or otherwise). Defendants deny the remaining allegations in this Paragraph, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

42.     Additionally, the Prime Therapeutics Pharmacy Provider Manual instructs Walgreens to submit, as its U&C charge, "the lowest price [Walgreens] would charge to a particular customer if such customer were paying cash for the identical Prescription Drug Services on the date dispensed.  This includes any applicable discounts including, but not limited to, senior discounts, frequent shopper discounts and other special discounts offered to attract customers."[24]

**ANSWER**: Defendants respectfully refer the Court to the cited Prime provider manual for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants specifically deny that WBA had any obligations under the Prime provider manual. Defendants deny the remaining allegations in this Paragraph, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

---

[24] Pharmacy Provider Manual, PRIME THERAPEUTICS LLC, § 6, at 30 (Mar. 1, 2015) (emphasis added), *available at* https://www.primetherapeutics.com/content/dam/corporate/Documents/Resources/Pharmacists/Pharmacy ProviderResources/ProviderManual/March12015PharmacyProviderManualEffectiveMarch12015.pdf.

43.    The current OptumRx Pharmacy Provider Manual,[25] which "includes the policies and procedures for pharmacies . . . which serve Members pursuant to [OptumRx's] participating pharmacy provider network agreements," contains this U&C guidance:

**Usual and Customary (U&C):**

Price charged by Network Pharmacy Provider to the general public at the time of dispensing for the same Drug Product including all applicable customer discounts, such as advertised or sale prices, special customer, senior citizen, frequent shopper, coupons or other discounts, a cash paying customer pays Network Pharmacy Provider for Drug Products, devices, products and/or supplies. Network Pharmacy Provider must supply proof of a cash Prescription (i.e. without any disclosure of PHI) when necessary to evaluate the appropriate adjudication of the Transaction. Alteration of the U&C price to attempt to increase Claim payment without a true change to the cash price being offered to the general public will be considered non- compliance and a violation of the Agreement. The Network Pharmacy Provider must be able to communicate the U&C price to Administrator upon inquiry, failure to disclose this information may be considered noncompliance.

**ANSWER**:  Defendants respectfully refer the Court to the OptumRx pharmacy provider manual for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

44.    The Catamaran Provider Manual published in 2013 told Cataraman's pharmacy providers, including Walgreens, that U&C meant "the usual and customary price charged by the Provider to the general public at the time of dispensing, including any advertised or sale prices, discounts, coupons or other deductions."[26]

---

[25] 2020 Pharmacy Provider Manual, OPTUMRX, *available at* https://learn.optumrx.com/content/dam/orx-rxmicros/pharmacy-manual/OptumRxPharmacyProviderManual2020-Version%203.1.pdf  (last accessed July 31, 2020).
[26] Provider Manual, CATAMARAN (2013), *available at* https://silo.tips/download/provider-manual-2013-4 (last accessed July 31, 2020).

**ANSWER**:  Defendants respectfully refer the Court to the Catamaran provider manual for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants specifically deny that WBA was ever a Catamaran pharmacy provider. Defendants deny the remaining allegations in this Paragraph, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

45.     Further, at the outset of Walgreens' fraudulent scheme, its own Illinois-based subsidiary created and issued statements confirming – falsely – that discounted pricing would be treated as U&C.  Walgreens' wholly-owned PBM subsidiary until 2011, WHI, defined U&C consistent with NCPDP requirements and industry standards.  WHI's Pharmacy Manual defined U&C as "the cash price including all applicable discounts, coupons or sale price which a cash-paying customer would pay at the pharmacy."[27]  In addition, WHI directed its own network pharmacies to use the standard NCPDP form containing the "usual and customary" field discussed above.  WHI was based in and operated out of Illinois.

**ANSWER**:  Defendants admit that WHI was a wholly-owned subsidiary of Walgreens until WHI was acquired by Catalyst Health Solutions Inc. in 2011. Defendants admit that WHI was a PBM. Defendants admit that WHI's principal place of business was located in Illinois. Defendants deny that WBA ever held any interest in WHI. Defendants deny that they engaged in a fraudulent scheme and that any statement referenced in Paragraph 45 confirmed that PSC Program prices would be treated as U&C. Defendants respectfully refer the Court to the WHI pharmacy manual referenced in this Paragraph for the manual's true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants specifically deny that

---

[27] Pharmacy Manual, WALGREENS HEALTH INITIATIVES, INC., 25 (Jan. 2011), *available at* http://www.walgreenshealth.com/pdf/forms/Revised_Pharmacy_Manual_2010_Revised_04072010.pdf (accessed Aug. 10, 2020).

Paragraph 45 accurately quotes the definition of U&C price included in the WHI pharmacy manual dated January 2011. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

46.    These provisions all recognize and implement the NCPDP requirements and industry standards, which required Walgreens to report, as the U&C charge, any discount price offered to cash-paying or "private pay" uninsured customers on all claims submitted to Plaintiffs through their PBMs and to accept payment of that discount price as payment in full.

**ANSWER**:  Defendants respectfully refer the Court to the provider manuals, NCPDP requirements, and contracts referenced in the preceding paragraphs for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants specifically deny that WBA ever reported a "U&C charge" or was required to report such information in any specific manner to Plaintiffs or their PBMs. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

47.    In short, Walgreens was well aware of both the definition of "usual and customary" and how the "usual and customary" price of a particular prescription drug should be calculated. But Walgreens knowingly and intentionally submitted inflated U&C prices for brand and generic drugs purchased by Plaintiffs' Members in a way that was antithetical to applicable law, requirements, and standards.

**ANSWER**:  Defendants admit that Walgreens knew the U&C price definitions in Walgreens' contracts with PBMs, knew that those definitions did not require Walgreens to report PSC Program prices as U&C prices, and knew that the PBMs (consistent with industry understandings of U&C prices) did not expect Walgreens to report PSC Program prices as U&C

prices. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

48.    At all relevant times, Walgreens knew that Plaintiffs contracted to receive the benefit of the prices that Walgreens charged to its customers who paid without insurance, including "discount" prices, in their reported U&C prices, including, for example, in the following contracts:

*CareFirst Plaintiffs*

a.    Since 2014, CFMI, GHMSI, and CareFirst BlueChoice's commercial contracts with CaremarkPCS Health have defined "usual and customary" prices as "the lowest price, including any Dispensing Fee, a pharmacy would charge a particular customer without any insurance coverage if such customer were paying cash for the identical Program Drug on the date Dispensed. This includes any applicable discounts, including but not limited to senior discounts, frequent shopper discounts, and other special discounts offered to customers."[28]

*BCBS South Carolina Plaintiffs*

b.    Since 2010, BCBS South Carolina's commercial contracts with CaremarkPCS Health have defined "usual and customary" prices as "the Participating Pharmacy's usual cash customer selling price for a drug if the product were not eligible for coverage by a third party as reported by the Participating Pharmacy."[29] BCBS South Carolina's Exchange Contract has defined "usual and customary" the same way.[30]

---

[28] Commercial Pharmacy Benefit Services Agreement between CareFirst and CaremarkPCS Health, LLC, Sch. A ¶ 158 (Jan. 1, 2014); Amended and Restated Commercial Pharmacy Benefit Services Agreement between CareFirst and CaremarkPCS Health, LLC, Sch. A ¶ 167 (Jan. 1, 2017); Pharmacy Benefit Services Agreement between CareFirst and CaremarkPCS Health, LLC, Sch. A ¶ 180 (Jan. 1. 2019).
[29] Managed Pharmacy Benefit Services Agreement between CaremarkPCS Health and BCBS South Carolina ("Caremark-BCBS South Carolina MPBSA"), § 1 (Oct. 1, 2010).
[30] Exchange Contract between CaremarkPCS Health and BCBS South Carolina, (Jan. 1, 2014).

*BCBS Louisiana Plaintiffs*

c.    Since 2004, the Blue Cross and Blue Shield of Louisiana plaintiffs' contracts with Express Scripts, Inc. ("ESI"), have defined usual and customary prices as "the retail price charged by the Participating Pharmacy for the particular drug in a cash transaction on the date the drug is dispensed as reported to ESI by the Participating Pharmacy."

**ANSWER**:    Defendants respectfully refer the Court to the contracts between Plaintiffs and Plaintiffs' PBMs referenced in Paragraph 48 for the contracts' true and complete contents, and Defendants deny any allegations inconsistent therewith.  Defendants further deny that WBA sold any prescription drugs, charged any drug prices to any customer, or entered into any agreements with Plaintiffs or their PBMs. Defendants deny the remaining allegations in this Paragraph, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**B.    The Pharmacy Claims Reimbursement Process.**

**49.**    As a general matter, third-party payors, including private and government payors, reimburse pharmacies for the insured portion of prescription drugs at the ***lesser of*** a negotiated price (as reflected in the pricing terms of a governing agreement) and the subject pharmacy's U&C price for both brand and generic prescription drugs.

**ANSWER**: Defendants admit that some PBMs reimburse pharmacies for a given individual prescription drug transaction at the lowest of a price negotiated by the PBM and pharmacy, the U&C price, and certain other contractually set price points. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

**50.**    NCPDP establishes and maintains the industry standard for electronic transmission and adjudication of pharmacy claims.  The NCPDP's standard form contains a specific data field,

designated as field 426-DQ, in which Walgreens represents its U&C charge for that prescription drug.

**ANSWER**: Defendants admit that the NCPDP publishes certain guidelines and standards for electronic transmission of pharmacies' reimbursement claims. Defendants respectfully refer the Court to the NCPDP's "standard form" for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny that WBA ever submits or represents any U&C charge for any prescription drugs to Plaintiffs or PBMs. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

51.     NCPDP defines the U&C price transmitted in the 426-DQ data field as the "[a]mount charged cash paying customers for the prescription exclusive of sales tax or other amounts claimed."[31]  The U&C price that Walgreens enters into field 426-DQ on a payment claim, the NCPDP standards explain, must represent "the value that a pharmacist is willing to accept as their total reimbursement for dispensing the product/service to a cash-paying customer."[32]

**ANSWER**:  Defendants respectfully refer the Court to the NCPDP Reference Manual cited in Paragraph 51 for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

52.     Congress has adopted the NCPDP standards through federal legislation, including the Health Insurance Portability and Accountability Act ("HIPAA"), the Medicare Modernization

---

[31] *See NCPDP Reference Manual*, Ch. 3 at 72 (rev. Oct. 2005), *available at* https://www.cms.gov/Medicare/Billing/ElectronicBillingEDITrans/downloads/NCPDPflatfile.pdf (accessed Aug. 10, 2020).

[32] *See Telecommunications Version 5*, NCPDP, 38 (Feb. 2010), *available at* https://ncpdp.org/members/pdf/Version_5_questions_v35.pdf (accessed Mar. 12, 2020).

Act ("MMA"), and the Health Information Technology for Economic and Clinical Health Act ("HITECH"). HIPAA, for example, requires uniform methods and codes for exchanging electronic information with health insurance plans. These standards are referred to as the NCPDP Telecommunication Standard. Pharmacies must report claims using NCPDP standards, *inter alia*, when prescribing drugs under Medicare Part D.[33]

**ANSWER**: Defendants respectfully refer the Court to the federal legislation referenced in Paragraph 52 for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

53. Whenever Walgreens fills a Member's prescription, Walgreens submits its claim for Plaintiffs' reimbursement on a standardized NCPDP electronic claim form.

**ANSWER**: Defendants deny that WBA fills any prescriptions or submits any claims for reimbursement to PBMs or Plaintiffs. Defendants deny that Walgreens submits any claims for reimbursement directly to, or receives any reimbursement directly from, Plaintiffs. Walgreens admits that, when submitting reimbursement claims to PBMs, Walgreens transmits certain information about the prescription transaction via an electronic transmission from the pharmacy to the PBM. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

54. In the retail pharmacy industry, health plans and other third-party payors often use PBMs to adjudicate and administer prescription benefits with a network of pharmacies on their behalf. When a health plan employs the services of a PBM, instead of submitting claims directly to the health plan, the retail pharmacy submits claims for payment from the health plan to the

---

[33] 42 C.F.R. § 423.160.

health plan's chosen PBM. PBMs directly pass on Walgreens' reported U&C prices to Plaintiffs as a basis for payment.

**ANSWER**: Defendants admit the allegations in the first sentence of Paragraph 54. Defendants admit that pharmacies submit reimbursement claims to the PBMs employed on behalf of health plans or other third-party payors. Defendants lack knowledge or information sufficient to form a belief as to whether PBMs pass on Walgreens' reported U&C prices to Plaintiffs or as to what information (if any) Plaintiffs consider as a "basis for payment." Defendants deny that WBA reports any prices to any PBMs or Plaintiffs. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

55. Walgreens submits its claims seeking Plaintiffs' reimbursement payments to the PBMs that process Plaintiffs' reimbursement claims. Since 2006, Plaintiffs have paid Walgreens through various PBMs, including Express Scripts and CVS/Caremark.

**ANSWER**: Defendants admit that Walgreens submits claims for prescription drug reimbursements involving Plaintiffs' members to Plaintiffs' designated PBMs and that those PBMs process and adjudicate the reimbursement claims. Defendants deny that WBA submits any claims for reimbursement to, or receives reimbursement payments from, any PBM or Plaintiff. Defendants lack knowledge or information sufficient to form a belief as to whether the PBM CVS/Caremark, PBM Express Scripts, and the other unspecified PBMs referenced in Paragraph 55 reimbursed Walgreens for prescription transactions involving Plaintiffs' members. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

56. The claims-processing and payment mechanics between Plaintiffs, Plaintiffs' various PBMs, and Walgreens work as follows:

a. A Member presents a prescription at a Walgreens pharmacy (or Walgreens-affiliated banner location) and purchases the corresponding prescription drug, less the share of the purchase price covered by the Member's prescription drug benefit.

b. Walgreens then reports to Plaintiff's PBM the data associated with the sale, including the U&C charge for the drug it dispensed to the Member, which Walgreens reports in NCPDP field 426-DQ.

c. Using Walgreens' reported information, Plaintiff's PBM adjudicates the claim on Plaintiff's behalf using the "lesser of" logic that incorporates the reported U&C price term.[34] If Walgreens' reported U&C price for the drug at issue is *greater* than the parties' other negotiated prices, Plaintiff pays, through its PBM, the negotiated price to Walgreens. If, on the other hand, Walgreens' reported U&C price for the drug at issue is *less* than the parties' other negotiated prices, then Plaintiff pays, through its PBM, the reported U&C price to Walgreens.

d. As part of the claims adjudication process, Plaintiff's PBM transmits to Plaintiffs the numerous fields of claims data in the prescribed NCPDP format, including field 426-DQ, which indicates the U&C charges Walgreens reported for the drug at issue.

**ANSWER**: Defendants admit that Plaintiffs' insureds from time to time fill prescriptions at Walgreens pharmacies and pay Walgreens any copay or co-insurance required by the insured's particular prescription drug benefit. Defendants admit that Walgreens submits reimbursement

---

[34] As described above, third-party payors reimburse pharmacies for the insured portion of prescription drugs at the *lesser of* a negotiated price (as reflected in the pricing terms of a governing agreement) or the subject pharmacy's U&C charge for prescription drugs.

claims for those transactions (typically including a reported U&C price) to the PBMs retained by Plaintiffs to adjudicate such reimbursement claims. Defendants admit that PBMs adjudicate the reimbursement claims submitted by Walgreens. Defendants admit that, at the moment a given individual reimbursement claim is first processed, some PBMs with which Walgreens contracts at least initially reimburse Walgreens for that claim at the lowest of various negotiated contract rates and the U&C Price. Defendants lack knowledge or information sufficient to form a belief as to the reimbursement amounts that Plaintiffs or other third-party payors pay to PBMs in connection with Walgreens' reimbursement claims. Defendants lack knowledge or information sufficient to form a belief as to what information PBMs submit to Plaintiffs after PBMs receive reimbursement claims from Walgreens. Defendants deny that WBA operates any pharmacy or reports any information or data to any PBM in connection with prescription drug sales. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

**57.**     At all relevant times, for each and every claim submitted by Walgreens to one of Plaintiffs' PBMs, Walgreens knew that the PBM at issue in turn either transmits Walgreens' reported U&C price (as represented in NCPDP field 426-DQ) to Plaintiffs, uses the reported U&C price when calculating a reimbursement amount per the contractual "lesser of" reimbursement formula, or both.

**ANSWER**:  Defendants deny that Walgreens knew what information, if any, Plaintiffs' PBMs submit to Plaintiffs or what calculation or adjudication method those PBMs use to determine the reimbursement amount that Plaintiffs owe the PBMs. Defendants deny that, for each and every claim submitted by Walgreens to one of Plaintiffs' PBMs, Walgreens knew that the given PBM would use the "lesser of" logic to determine the reimbursement amount that the PBM owed

Walgreens for that claim. Defendants deny that WBA operates any pharmacy or reports any information or data to any PBM in connection with prescription-drug sales. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

58.     At all relevant times, Walgreens knew that Plaintiffs directly relied upon Walgreens' reported U&C prices in reimbursing Walgreens through their PBMs, as described above for prescription claims submitted by Walgreens to Plaintiffs via Plaintiffs' PBMs.

**ANSWER**: Defendants deny the allegations in Paragraph 58, except that Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

59.     At all relevant times, Walgreens knew that the electronic claims adjudication process used the NCPDP field 426-DQ data as a necessary input.  Walgreens also knew that Plaintiffs' PBMs and Plaintiffs relied on the NCPDP field 426-DQ data as necessary business information in calculating and paying Members' prescription reimbursements on both brand and generic claims submitted by Walgreens.

**ANSWER**:  Defendants deny the allegations in Paragraph 59, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

### C.     Walgreens Developed its Prescription Savings Club to Compete with "Big Box" Retailers While Maintaining Fraudulently Inflated Reimbursements from Plaintiffs.

60.     In 2006, "big box" retailers like Walmart began to launch prescription drug programs that offered steeply discounted prices for hundreds of popular prescription drugs to cash customers. For example, in September 2006, Walmart began offering $4 for 30-day supplies and $10 for 90-day supplies of the most commonly prescribed generic drugs. Walmart's formulary of low-priced generics initially included approximately 140 drugs (totaling more than 300 formulations). Walmart's competitors, including Target and Costco, responded with similar

prescription discount programs. Many retailers whose primary line of business was not operating a pharmacy, which were able to absorb lower margins on generic drug sales because pharmacy sales represent such a low percentage of total sales, followed suit. Walmart, Target, and Costco submit their discounted prices as their U&C prices to third-party payors, including Plaintiffs.

**ANSWER**: Defendants admit that, in 2006, Walmart and Target each announced programs to charge $4 for a 30-day supply and $10 for a 90-day supply of certain specified generic drugs. Defendants lack sufficient knowledge to admit or deny whether the drugs in Walmart's program were "the most commonly prescribed generic drugs" or how many prescription drugs were included in the program. On information and belief, Defendants admit that, because Walmart and Target charge the reduced prices to anyone who purchases generic drugs covered by the programs, without requiring enrollment in a membership program or other affirmative steps (such as the payment of a membership fee), the reduced prices are the pharmacies' retail prices and, therefore, properly submitted to PBMs as the pharmacies' U&C prices. Defendants lack knowledge or information sufficient to form a belief as to what Walmart or Target report as U&C prices to PBMs retained by Plaintiffs and other third-party payors, or whether Walmart or Target report U&C prices to Plaintiffs and other third-party payors at all. Defendants lack knowledge or information sufficient to form a belief as to Costco's historical pricing or U&C reporting practices or as to the pricing or U&C reporting practices of other, unspecified "big box" retailers or "competitors." Defendants lack knowledge or information sufficient to form a belief as to the unspecified retailers' ability to absorb lower margins on generic drug sales or as to the percentage of their business comprising pharmacy sales. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

61.     Walgreens executives labeled these competitor programs as "limited promotions" that provided "no significant savings for the vast majority" of cash customers, concluding that programs like Walmart's generics program were "not positive for healthcare."[35]

**ANSWER**: Defendants respectfully refer the Court to the annual report referenced in Paragraph 61 for its true and complete contents, and deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

62.     Walgreens was unwilling to price match Walmart and other "big box" retailers on generic drug prices. In response to those competitor programs, however, Walgreens launched its PSC Program in 2007 to target cash customers and other price-sensitive customers. By 2008, Walgreens offered PSC Program prices at all of its U.S. retail pharmacy locations.[36]

**ANSWER**: Defendants admit that, in 2007, Walgreens launched pilots of the PSC Program. Defendants admit that Walgreens designed the PSC Program primarily to provide lower prices for price-sensitive customers (including uninsured or under-insured patients) who otherwise might struggle to pay full retail prices for prescription medications. Defendants further admit that Walgreens launched the PSC Program nationwide in August 2008. Defendants deny that patients who fill prescriptions through the PSC Program are "cash customers," as that term is used in Walgreens' PBM contracts and industry parlance. Defendants further deny that WBA created or operates the PSC Program or sells prescription medication to any patients. To the extent this Paragraph purports to characterize or recite the contents of the settlement agreement cited in footnote 36, Defendants respectfully refer the Court to the settlement agreement for its true and

---

[35] See Jeffrey A. Rein, Walgreens President & CEO, "*Letter to Shareholders*," 2006 Annual Report, WALGREEN CO., at 4.
[36] Walgreens' DOJ Settlement at ¶ 2(a).

complete contents, and Defendants deny any such purported characterizations or recitations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

63. But unlike the "big box" retailers, Walgreens did not submit its discount prices as U&C. Instead, it submitted prices that were often substantially higher than the discount prices as the U&C.

**ANSWER**: On information and belief, Defendants admit that, because Walmart and Target charge the reduced prices to anyone who purchases generic drugs covered by the programs, without requiring enrollment in a membership program or other affirmative steps (such as the payment of a membership fee), the reduced prices are the pharmacies' retail prices and, therefore, properly submitted to PBMs as the pharmacies' U&C prices—unlike Walgreens' PSC Program prices. Defendants lack knowledge or information sufficient to form a belief as to the U&C prices reported by "'big box' retailers." Defendants admit that Walgreens did not submit PSC Program prices as its U&C prices because PSC Program prices do not qualify as U&C prices. Defendants deny that WBA submitted any U&C prices to PBMs or Plaintiffs at any time. Defendants lack knowledge or information sufficient to establish a belief as to whether unspecified "submitted prices" for unspecified drugs were "substantially higher" than unspecified "discount prices" for an undefined period of time. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

64. Initially, Walgreens' PSC Program offered between 300 and 400 generic medications at $12.99 for a 90-day supply. For those medications, Walgreens advertised a discount price list with some basic information about the eligible medications (*e.g.*, the drug name, strength, and quantity).

**ANSWER**:  Defendants admit that as of December 13, 2007, the PSC Program offered over 300 generic medications at $12.99 for a 90-day supply. Defendants admit that, from 2007 to the present, Walgreens publicly advertised a formulary with information on the medications included in the PSC Program and the prices for those medications. Defendants deny that WBA offered or advertised any prescription drugs under the PSC Program to any patients. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

65.     Walgreens' price lists provided limited information that was insufficient to identify specific drugs eligible for discounted PSC Program prices.  For example, Walgreens did not provide the National Drug Code ("NDC"), a 10-digit universal product identifier for prescription drugs dispensed in the United States.  As a specific illustration of this, the Walgreens PSC Program price list advertised 90 tabs of Lisinopril 10mg for $12.99.[37]  According to the U.S. Food & Drug Administration's NDC Directory, there are at least 24 different products sold by at least 15 different companies that meet this description.[38]  Nor did Walgreens provide other industry-standard drug identifiers on its PSC Program price list, like the Generic Product Identifier ("GPI"), Generic Sequence Number ("GSN"), or Generic Code Number ("GCN").

---

[37] "Walgreens Prescription Savings Club" (Dec. 13, 2007) (attached hereto as **Exhibit 1**).
[38] The NDCs include: 53217-303-90, 52427-440-90, 43353-113-60, 50090-1737-5, 71335-0536-4, 70934-200-90, 55700-479-90, 55700-513-90, 49999-182-90, 68180-980-09, 68180-514-09, 63739-349-43, 0006-0106-54, 66267-577-90, 68788-8912-9, 68788-6407-9, 68788-9823-9, 68788-6782-9, 68788-9912-9, 63187-098-90, 63187-821-90, 70518-0530-3, and 50436-0353-3. The manufacturers include: Aidarex Pharmaceuticals LLC; Almatica Pharma Inc.; Aphena Pharma Solutions - Tennessee, LLC; A-S Medication Solutions; Bryant Ranch Prepack; Denton Pharma, Inc. DBA Northwind Pharmaceuticals; Lake Erie Medical DBA Quality Care Products LLC; Lupin Pharmaceuticals, Inc.; McKesson Corporation; Merck Sharp & Dohme Corp.; NuCare Pharmaceuticals, Inc.; Preferred Pharmaceuticals Inc.; Proficient Rx LP; REMEDYREPACK INC.; and Unit Dose Services.

**ANSWER**: Defendants deny the allegations in the first sentence of Paragraph 65. Defendants admit that Walgreens' public advertising for the PSC Program identified drugs on the PSC Program formulary only by drug name, not by NDC, GPI, GSN, or GCN, but Defendants specifically deny that NDCs, GPIs, GSNs, or GCNs were necessary to identify specific drugs included on the formulary or to recognize the basis for Plaintiffs' causes of action asserted in the Complaint. Defendants further deny that WBA created, operated, or advertised the PSC program. Defendants respectfully refer the Court to the U.S. Food & Drug Administration's NDC Directory for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants lack knowledge or information sufficient to form a belief as to whether any publicly available information about the PSC Program contained information related to "other industry-standard drug identifiers" alluded to but not identified in Paragraph 65. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

66.     The PSC Program was not limited to so-called "value-priced generics" listed on advertised formularies.  In addition to these steeply discounted "value-priced" drugs, the PSC Program offered discounted prices on approximately 5,000 to 8,000 other brand and generic prescription drugs to Walgreens' cash-paying customers.  Walgreens did not advertise lists or pricing information for the "other name brand and generic prescription medications" eligible for PSC Program prices.  Further, Walgreens did not provide lists of the "other name brand and generic prescription medications" eligible for PSC Program prices to Plaintiffs or, on information and belief, to any of the PBMs that processed Plaintiffs' reimbursement claims.

**ANSWER**: Defendants admit that the advertisement attached to the Complaint as Exhibit 1 says that PSC Program members can access "savings on over 5,000 name brand and generic

medications." Defendants admit that the PSC Program formulary includes thousands of generic medications. Defendants deny that PSC members who fill prescriptions through the PSC Program are "cash customers," as that term is used in Walgreens' PBM contracts and industry parlance. Defendants deny that WBA sells prescription drugs to patients or reports drug prices to any Plaintiff or PBM. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

67.     Walgreens claimed that these discount prices were only available to cash-paying customers who paid an enrollment fee. But Walgreens' statements to that effect were illusory and intentionally misleading. Contrary to Walgreens' assertions that the PSC was a fee-based membership program, the "enrollment fee" (which was nominal at best) was a sham. In its recent settlement with the U.S. Department of Justice, for example, Walgreens admitted that it regularly returned "enrollment fees" to its PSC Program enrollees through, *e.g.*, store credits.[39]

**ANSWER**: Defendants admit that PSC Program prices are only available to customers who take affirmative steps to enroll in the program. Such steps include, among other things, requesting to enroll in the program, agreeing to abide by the program's terms and conditions, consenting to Walgreens' use of the customer's personal health and other information, and paying a membership fee. Defendants deny that PSC members who fill prescriptions through the PSC Program are "cash customers," as that term is used in Walgreens' PBM contracts and industry parlance. Defendants admit that, on December 14, 2018, Walgreens signed a Stipulation and Order of Settlement and Dismissal, which was entered by the United States District Court for the Southern District of New York on January 15, 2019, and filed on the public docket on January 24, 2019, to resolve claims related to the definition of U&C price in certain states' Medicaid

---

[39] Walgreens' DOJ Settlement ¶ 2(b).

regulations and related guidance. WBA denies that it was a party to the suit or settlement. Defendants respectfully refer the Court to the Stipulation and Order of Settlement and Release, *U.S. ex rel. Baker v. Walgreen Co.*, No. 12-cv-0300, Dkt. 53 (S.D.N.Y. Jan. 24, 2019), for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

68. But whether Walgreens charged a nominal enrollment fee in certain instances does not alter the fact that—unbeknownst to Plaintiffs—Walgreens offered the PSC to anyone who wanted to join and made its discounted drug prices under the PSC widely and consistently available to the general public, and thus they cannot be excluded from Walgreens' U&C price. Significantly, in United States ex rel. Garbe v. Kmart Corp., the Seventh Circuit stated that "[a]llowing Kmart to insulate high 'usual and customary' prices by artificially dividing its customer base would undermine a central purpose of the statutory and regulatory structure. The 'usual and customary' price requirement should not be frustrated by so flimsy a device as Kmart's 'discount programs.' Because Kmart offered the terms of its 'discount programs' to the general public and made them the lowest prices for which its drugs were widely and consistently available, the Kmart 'discount' prices at issue represented the 'usual and customary' charges for the drugs." 824 F.3d 632, 645 (7th Cir. 2016), *cert. denied*, 137 S.Ct. 627 (Jan. 9, 2017).

**ANSWER**: Defendants admit that Walgreens made the PSC Program available to any patient who enrolled in the program, met enrollment criteria, paid the annual membership fee, agreed to abide by all of the program's terms and conditions, and consented to Walgreens' use of the customer's personal health and other information, including Plaintiffs and their employees and other representatives. Defendants deny that the enrollment fee was nominal. Defendants deny that

PSC Program prices were "widely and consistently available to the general public." Defendants deny that WBA operated or offered the PSC Program or made any PSC Program prices available to anyone. Defendants respectfully refer the Court to the Seventh Circuit's opinion in *U.S. ex rel. Garbe v. Kmart Corp.*, 824 F.3d 632 (7th Cir. 2016), for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants specifically deny that Garbe is controlling or factually or legally relevant to this consolidated action. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

69.     The drugs discounted by the PSC Program were not static. Walgreens regularly revised the brand and generic drugs eligible for PSC Program discounts, the price points at which the drugs were eligible, and the quantum of discounts offered on those drugs. When it revised its PSC Program drug lists, Walgreens did not provide notice to Plaintiffs or, on information and belief, to any of the PBMs that processed Plaintiffs' reimbursement claims.

**ANSWER**:   Defendants admit that, at a few points between 2007 and the present, Walgreens changed the list of drugs on the PSC Program formulary and the prices offered through the program. Defendants deny that WBA ever updated, changed, or revised any aspect of the PSC Program or its formularies, price lists, or "drug lists." Defendants specifically deny the allegations in the last sentence of Paragraph 69. Defendants admit that revisions to the PSC Program formulary, price lists, and terms and conditions were publicly announced on Walgreens' websites and at all times available to Plaintiffs and their PBMs. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

70.     Walgreens' PSC Program continues today.  In its current form, which was launched on or about May 1, 2012, Walgreens' PSC Program allows cash-paying customers to purchase hundreds of prescription drugs on its formulary list for $5.00, $10.00, or $15.00 for 30-day supplies and $10.00, $20.00, and $30.00 for 90-day supplies.  The discount price depends on Walgreens' "tier" classification of the particular drug.  Many of the drugs discounted on the formulary are among the most widely-prescribed drugs in the United States.  Walgreens has also represented that even for brand and generic drugs not listed on this formulary, Walgreens offers reduced PSC Program pricing in other denominations to cash-paying customers.

**ANSWER**:   Defendants admit that Walgreens continues to offer the PSC Program. Defendants deny that PSC Program members are cash-paying customers as that term is used in Walgreens' PBM contracts and industry parlance. Defendants deny that WBA operates or ever operated the PSC Program. Defendants admit that, from approximately 2012 to the present, the PSC Program has offered three pricing tiers for prescription drugs purchased through the program by its members. Defendants lack knowledge or information sufficient to form a belief as to whether "many of the drugs discounted on the [PSC] formulary are among the most widely-prescribed drugs in the United States." Defendants admit that Walgreens' PSC formulary includes thousands of generic drugs and that Walgreens attempted to provide prices lower than its retail prices (also known as its cash prices) on all included generics, but denies that it always did provide prices lower than its retail prices on generics included within PSC. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

71.     Moreover, Walgreens continues to "offer" a similar "Rx savings program"—the JustRx Program—to customers who pay without using insurance at more than 1,900 Walgreens-

owned Rite Aid stores,[40] as well as Walgreens- and Duane Reade-branded Walgreens pharmacies.[41] The JustRx Program is "simple and free; there is no annual or up-front membership fee to participate."[42] Like the PSC Program, the JustRx Program provides cash-paying customers with discounts on "all" prescription drugs (and not just those listed on program formularies), with significant discounts available on drugs listed on advertised "value-priced medication" formularies.[43]

**ANSWER**:  Defendants deny that Walgreens or WBA administers, operates, or controls the JustRx Program. Defendants admit that Walgreens has agreed to honor the Just Rx Program's lower prices at certain Walgreens pharmacies. Defendants deny that the website cited in footnotes 41 and 42 contains the quoted language contained in Paragraph 71. Defendants respectfully refer the Court to the Just Rx website for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

### D. Walgreens Reported False U&C Charges.

72.     Instead of submitting its discounted PSC Program prices, JustRx Program prices, third-party discount card program prices, or other discounted cash prices as U&C, Walgreens inflated the U&C prices that it reported to Plaintiffs and their PBMs by pegging Walgreens'

---

[40] *See* "Welcome Rite Aid Pharmacy Patients," ("Walgreens is pleased to offer existing Rite Aid patients a new Rx savings program called 'JustRx.' JustRx is simple and free; there is no annual or up-front membership fee to participate.  JustRx offers eligible patients cost savings on over 300 commonly prescribed generic medications, prices starting at $9.99 for a 30 day supply.  It also includes an average of 40% savings on value priced brand drugs that were not previously available.").

[41] "Value Priced Generics," JUSTRX ("Value-Priced Generics . . . [a]vailable at Walgreens, Duane Reade and Rite Aid Pharmacies Operated by Walgreens."), *available at* https://justrx.com/generics (accessed Mar. 10, 2020).

[42] *Id.*

[43] "Frequently Asked Questions," JUSTRX, *available at* https://justrx.com/faq (accessed Aug. 10, 2020).

reported U&C prices to higher prices that did not reflect the cash prices offered to PSC Program enrollees, JustRx Program participants, third-party discount program cardholders, or other discounted prices.

**ANSWER**:  Defendants admit that Walgreens did not report, as U&C charges, the prices paid by members of discount programs that required the members to take affirmative steps to enroll in the program; such discount program prices do not qualify as Walgreens' U&C prices—that is, as the retail price paid by cash customers. Defendants specifically deny that WBA has ever submitted U&C prices to any PBM or public or private insurance plan. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

73.    There is no dispute that Walgreens did **not** in fact report its PSC Program prices, JustRx Program prices, third-party discount card program prices, or other discounted prices for prescription drugs made available to those paying without insurance as its U&C price.  For example, with respect to PSC Program prices specifically, Walgreens "admit[ted], acknowledge[d], and accept[ed] responsibility for" failing to do so in its January 2019 settlement stipulation with the U.S. Department of Justice, stating that "Walgreens did not identify its PSC program prices as its U&C prices for the drugs on the PSC formulary" on Medicaid fee-for-service claims.[44]

**ANSWER**: Defendants admit that Walgreens did not report, as U&C charges, the prices paid by members of discount programs that required the members to take affirmative steps to enroll in the program; such discount program prices do not qualify as Walgreens' U&C price—that is, as the retail price paid by cash customers. Defendants respectfully refer the Court to the Just Rx

---

[44] Walgreens' DOJ Settlement at ¶ 2.

website for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants respectfully refer the Court to the Stipulation and Order of Settlement and Release, *U.S. ex. rel. Baker v. Walgreen Co.*, No. 12-cv-0300, Dt. 53 (S.D.N.Y. Jan 24, 2019), for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

74.     For many millions of transactions, Walgreens caused Plaintiffs to pay Walgreens the negotiated price because the negotiated price was lower than the *reported inflated* U&C price. For those many millions of transactions, Walgreens should have reported the true U&C price (*i.e.*, the lowest prices for which its drugs were widely and consistently available).  Had it done so, the adjudicated price—ultimately the price paid by Plaintiffs for the claim—would have, in many cases, been lower than what Plaintiffs paid based on Walgreens reporting a false and inflated U&C price.

**ANSWER**:  Defendants admit that for some reimbursement claims submitted by Walgreens to Plaintiffs' PBMs, Plaintiffs paid their PBMs a price that was lower than the U&C price reported with the reimbursement claim. Defendants deny that PSC Program prices were "widely and consistently available to the general public." Defendants specifically deny that the purported definition of "true U&C price" in the second sentence of this Paragraph accurately reflects how that term is used and defined in Walgreens' PBM contracts and industry parlance. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

75. How Walgreens overcharged Plaintiffs on millions of claims is exemplified by the examples of apparent overcharges detailed in the attached **Exhibit 2** to this Complaint.[45]

**ANSWER**:  Defendants deny the allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

76. Since 2007, when Walgreens first implemented its PSC Program, Walgreens has submitted to Plaintiffs, through Plaintiffs' PBMs, more than **324 million** brand and generic retail pharmacy claims for payment using the standardized NCPDP format. For those approximately 324 million claims, Plaintiffs have reimbursed Walgreens more than $21.7 billion.

**ANSWER**:  At this time, Defendants lack knowledge or information sufficient to form a belief as to whether Walgreens has submitted more than 324 million brand and generic retail pharmacy claims to Plaintiffs through Plaintiffs' PBM agents using the NCPDP format, or whether the total Plaintiffs have reimbursed Walgreens through Plaintiffs' PBMs is more than $21.7 billion. Defendants admit that Walgreens' prescription drug reimbursement claims are submitted to Plaintiffs' PBMs based on the contractual requirements dictated by Walgreens' contracts with each PBM. Defendants specifically deny that WBA submits any brand or generic retail pharmacy claims to Plaintiffs, through Plaintiffs' PBMs or otherwise. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

---

[45] These exemplar overcharges are based on assumptions Plaintiffs have made as a result of the limited information available to them regarding Walgreens PSC Program and will be confirmed through review and analysis of Walgreens' cash transaction data.  As described above in, *inter alia*, paragraph 67, the PSC Program's advertised price lists did not provide all of the information that Plaintiffs need to identify specific drugs eligible for discounted PSC Program prices.  Chiefly, the PSC Program price lists omitted NDCs, GPIs, GCNs, GSNs, and other industry-standard drug identifiers, which are necessary to determine whether an overcharge has indeed occurred.

**77.** Walgreens' false and misleading U&C reporting caused Plaintiffs to significantly overpay Walgreens on many millions of those Walgreens claims for brand and generic drugs.

**ANSWER**: Defendants deny the allegations in Paragraph 77, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**78.** Walgreens' fraudulent scheme took place primarily and substantially in Illinois. Walgreens has administered, and continues to administer, its PSC Program from Walgreens' corporate headquarters in Deerfield, Illinois, where Walgreens developed the PSC Program. The PSC Program's Terms & Conditions state that the "PSC is administered by WAGDCO, LLC, a wholly-owned subsidiary of Walgreen Co.," whose offices are located at 104 Wilmot Road in Deerfield, Illinois. Publicly-available state and federal regulatory and court filings made by Walgreens indicate that WAGDCO has administered the PSC Program since at least 2015, and in so doing has had full responsibility for obtaining and holding the licenses required to operate the PSC in various states, setting and reporting to state regulatory bodies the discount amounts provided through the PSC, negotiating and maintaining PPAs with local pharmacies offering the PSC Program, and securing the discount rates offered through the PSC. These filings also indicate that WAGDCO's own day-to-day operations are subcontracted to another of Walgreens' wholly-owned subsidiaries headquartered in Illinois, Walgreens Business Services, LLC, which manages the PSC Program's member enrollment, fee collection, advertising and marketing, discount adjudication process, and maintenance of the PSC Program's participating provider network. Since at least 2008, Walgreen Co.'s Illinois-based investor relations division has recognized the success of these Illinois-based subsidiaries and the PSC Program as its own, reporting in multiple Deerfield, Illinois press releases that Walgreen Co.'s financial well-being was buoyed by the PSC

Program.  These public statements omitted disclosures that the PSC pricing discounts were not being provided to health plans, including Plaintiffs, as U&C.

**ANSWER**: Defendants admit that Walgreens' corporate headquarters are in Deerfield, Illinois, and that employees who worked at Walgreens' corporate headquarters were involved in creating PSC. Defendants respectfully refer the Court to the PSC Program's Terms and Conditions for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants admit that WAGDCO, LLC is a wholly-owned subsidiary of Walgreens, and that WAGDCO, LLC's offices are located at 104 Wilmot Road, Deerfield, IL 60015. Defendants lack knowledge or information sufficient to form a belief as to the contents of the unspecified, uncited "[p]ublicly-available state and federal regulatory and court filings," or as to the contents of the unspecified, uncited "press releases" regarding the effect of the PSC Program on Walgreens' "financial well-being." Defendants respectfully refer the Court to those documents for their true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

79.     Walgreens admitted in a U&C fraud settlement with the Department of Justice that "[i]n submitting claims for reimbursement" Walgreens "did not identify its PSC program prices as its U&C prices for the drugs on the PSC program formulary, which resulted in the States paying more in reimbursement than they would have paid if WALGREENS had identified its PSC program prices."  The remedial actions required of Walgreens by the U.S. Government reflect the senior level involvement of Walgreens' Illinois-based management.  The Corporate Integrity Agreement that Walgreens was required to execute with the U.S. Department of Health and Human Services requires certifications from "the Senior Vice President, Pharmacy; Senior Vice President,

Pharmacy and Retail Operations; Senior Vice President, Operations; Senior Vice President, Chief Financial Officer Retail Pharmacy; and Senior Vice President, Chief Human Resources Officer," (all located in Illinois); the appointment of a Compliance and Ethics Officer (also located in Illinois); and periodic reports to the Audit Committee of the Board of Directors of Walgreens Boots Alliance, Inc. (located in Illinois).

**ANSWER**: Defendants respectfully refer the Court to the Stipulation and Order of Settlement and Release, *U.S. ex. rel. Baker v. Walgreen Co.*, No. 12-cv-0300, Dt. 53 (S.D.N.Y. Jan 24, 2019), for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants respectfully refer the Court to the Corporate Integrity Agreement between the Office of Inspector General of the Department of Health and Human Resources and Walgreens for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

### E.    Tolling of the Statute of Limitations.

**80.**    As alleged herein, Walgreens affirmatively presented claims for reimbursement to Plaintiffs, through Plaintiffs' PBMs, that contained false and inflated U&C prices and further acted to conceal the true U&C prices being charged to its cash customers.

**ANSWER**:  Defendants admit that Walgreens presented claims for reimbursement to PBMs employed by Plaintiffs. Defendants specifically deny that WBA has ever submitted U&C prices to any PBM or public or private insurance plan. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

**81.**    Furthermore, Walgreens used its marketing of the PSC Program to conceal the fraudulent scheme it had implemented. Walgreens marketed the PSC Program as being a "club"

that required "membership" in order to obtain the discount pricing. Walgreens' marketing effort was meant to present the PSC Program as an "exclusive" program, not available to the general public. In reality, however, the PSC Program was not exclusive and was available to the general public. Walgreens used its marketing to conceal the true nature of the PSC Program and the fact that cash-paying customers were paying U&C prices that were lower than the U&C prices Walgreens reported to Plaintiffs.

**ANSWER**: Defendants admit that Walgreens made PSC Program membership available to any customer, but members had to take affirmative steps in order to join and receive the lower prices available to members of the program. Such steps include, among other things, enrolling in the program, agreeing to abide by the program's terms and conditions, consenting to Walgreens' use of the customer's personal health and other information, and paying a membership fee to join. Defendants admit that only PSC Program members were entitled to and did receive lower PSC Program pricing. Defendants admit that Walgreens broadly and publicly advertised the PSC Program throughout the program's almost 15-year existence. Defendants specifically deny that cash-paying customers paid U&C prices lower than the U&C prices that Walgreens reported to Plaintiffs. Defendants specifically deny that WBA marketed or operated the PSC Program. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

82. Walgreens does not provide Plaintiffs with records of transactions involving Walgreens' cash customers, including cash customers paying PSC Program prices, JustRx Program prices, third-party discount card program prices, or other discounted cash prices.

**ANSWER**: Defendants admit that Walgreens does not communicate with, or provide any records of transactions to, Plaintiffs. Defendants deny that WBA provides records of transactions

involving any customers to any third-party payor or PBM. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

83.     Plaintiffs had no information regarding how many of Walgreens' customers were in the PSC Program or JustRx Program, used third-party discount card programs, or received other discounts. Plaintiffs further had no information regarding the actual cash prices charged to customers, or any other information regarding Walgreens' cash transactions for prescription drugs.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to Plaintiffs' knowledge. Defendants deny that Plaintiffs "had no information regarding the actual cash prices charged to customers"; Walgreens provides that information to Plaintiffs' agents, their PBMs. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

84.     Plaintiffs could not have discovered the truth regarding Walgreens' fraudulent scheme because Walgreens actively concealed information and data from Plaintiffs that was necessary to understand the facts underlying Walgreens' scheme.

**ANSWER**: Defendants deny the allegations in Paragraph 84, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

85.     Walgreens knew that Plaintiffs would ultimately rely upon the claims data, including the reported U&C charge, that Walgreens submitted to them to pay the claims, and Plaintiffs relied on Walgreens to report its U&C charges truthfully and consistent with industry practice, government regulations, and contract definitions.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to what information Plaintiffs rely upon when paying prescription drug reimbursement claims

adjudicated and processed by Plaintiffs' agents, the PBMs. Defendants deny that they knew Plaintiffs' PBMs would rely upon any information other than the information that Walgreens was contractually obligated to report pursuant to its contracts with the PBMs. Defendants specifically deny that WBA submitted any information, including U&C charges, to Plaintiffs or their PBMs. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

86.     Walgreens repeatedly has refused requests made by third-party payors like Plaintiffs to produce relevant cash pricing transaction data necessary to validate Walgreens' reported U&C prices like those submitted to Plaintiffs, *i.e.*, records of transactions involving Walgreens' cash-paying and uninsured customers.

**ANSWER**: Defendants deny the allegations in Paragraph 86, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

87.     Walgreens never notified Plaintiffs that it excluded the prices charged on millions of its steeply discounted PSC Program, JustRx Program, third-party discount card programs, and other discount sales to cash customers from the U&C prices that it reported to Plaintiffs, through Plaintiffs' PBMs, on claims submitted for payment.

**ANSWER**: Defendants deny the allegations in Paragraph 87, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

88.     Instead, Walgreens established a covert two-track U&C pricing system: one price *reported* as U&C on claims for those customers that used an insurance benefit provided by Plaintiffs; and a different—and almost universally lower—price *actually charged* to customers who did not use an insurance benefit (*i.e.*, cash-paying customers).

**ANSWER**: Defendants deny the allegations in Paragraph 88, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

89.     Under this two-track U&C pricing system, Walgreens knowingly and intentionally submitted inflated prices to Plaintiffs, through Plaintiffs' PBMs, as U&C.

**ANSWER**: Defendants deny the allegations in Paragraph 89, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

90.     By knowingly and intentionally reporting inaccurate U&C charges to Plaintiffs, through Plaintiffs' PBMs, in order to obtain inflated reimbursements for millions of brand and generic prescriptions filled for and sold to Members at Walgreens pharmacies across the country, knowing at all times that Plaintiffs would rely upon the NCPDP field 426-DQ data in making payment decisions, Walgreens misled Plaintiffs and caused Plaintiffs to overpay many millions of dollars.

**ANSWER**: Defendants deny the allegations in Paragraph 90, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

91.     Walgreens submitted millions of claims for payment to Plaintiffs, through Plaintiffs' PBMs—almost all of which included inflated (false) U&C charges.

**ANSWER**:  Defendants admit that Walgreens submitted millions of claims for payment to Plaintiffs' PBMs. Defendants specifically deny that WBA ever submitted a claim for payment to Plaintiffs' PBMs. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

92.     Walgreens took other active steps to hide its scheme from Plaintiffs.  For example, Walgreens frequently, and without providing any notice to Plaintiffs, changed its PSC Program's scope and prices.  Walgreens also used its marketing terminology as subterfuge to make it look

like the PSC Program provided exclusive, limited "club" prices instead of discount cash prices available to the general public.

**ANSWER**: Defendants deny the allegations in Paragraph 92, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

93.     Walgreens' systematic reporting of inflated U&C charges and its deliberate obfuscation of the cash pricing information for most of the drugs eligible for PSC Program discounts, inter alia, prevented Plaintiffs from recognizing Walgreens' misleading and fraudulent pricing scheme.

**ANSWER**: Defendants deny the allegations in Paragraph 93, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

94.     Walgreens knowingly and fraudulently concealed its true U&C prices every time it reported prices higher than its PSC Program, JustRx Program, third-party discount card program prices, and other discounted cash prices to Plaintiffs, through Plaintiffs' PBMs, in the NCPDP 426-DQ data field—for many millions of prescriptions that it submitted for payment to Plaintiffs.

**ANSWER**: Defendants deny the allegations in Paragraph 94, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

95.     As a result of Walgreens' fraudulent concealment, the running of any statute of limitations has been tolled with respect to any claims that Plaintiffs have as a result of the unlawful conduct alleged in this Complaint.

**ANSWER**: Defendants deny the allegations in Paragraph 95, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

96.     Plaintiffs discovered the bases for the causes of action set forth in this Complaint not earlier than January 2019.

**ANSWER**: Defendants deny the allegations in Paragraph 96, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

97.     Since Plaintiffs were unable to know the truth regarding Walgreens' fraudulent conduct until, at the earliest, January 2019, the discovery rule applies to delay the commencement of any statute of limitations that may be applicable to Plaintiffs' claims resulting from the unlawful conduct alleged in this Complaint.

**ANSWER**: Defendants deny the allegations in Paragraph 97, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

98.     As of the date of the filing of this Complaint, Walgreens continues to submit inflated U&C prices for payment by Plaintiffs, via Plaintiffs' PBMs, on claims for generic and brand-name prescription drugs. Walgreens' inflated U&C prices are in excess of the prices that it charges millions of cash-paying customers enrolled in the PSC Program, JustRx Program, or other third-party discount card programs, and other discounted prices for the very same drugs. On millions of payment claims, Walgreens continues to collect higher payment amounts from Plaintiffs than that to which it is entitled.

**ANSWER**: Defendants admit that, as of the date of the Complaint's filing, Walgreens continues to submit to Plaintiffs' PBMs reimbursement claims for prescription drugs sold to Plaintiffs' members, and that Plaintiffs continue to reimburse those claims despite knowing all pertinent details of Walgreens' price-reporting practices. Defendants admit that some of Walgreens' reported U&C prices are higher than prices available to the PSC Program's members. Defendants specifically deny that WBA submitted any information, including U&C charges, to Plaintiffs or their PBMs. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

99. Moreover, to the extent that any statute of limitations applies to any of Plaintiffs' claims, the running of that limitations period has been tolled by the class action tolling doctrine pursuant to the United States Supreme Court's decision in *American Pipe & Construction Co. v. Utah*, 414 U.S. 538 (1974), and subsequent decisions.

**ANSWER**: Defendants deny the allegations in Paragraph 99, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

## FIRST CLAIM FOR RELIEF (COUNT I)
## FRAUD

100. Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 99 above.

**ANSWER**: Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding Paragraphs as if fully set forth herein.

101. On millions of claims for payment, Walgreens deliberately submitted to Plaintiffs, through Plaintiffs' PBMs, inflated U&C prices in the NCPDP field 426-DQ that were significantly higher than the prices available to individuals who paid without insurance for prescription drugs. Walgreens made misrepresentations to Plaintiffs' PBMs and Plaintiffs each time it reported prices higher than the prices available to individuals who paid without insurance as its U&C charges in the 426-DQ data field on the standardized NCPDP price form.

**ANSWER**: Defendants deny the allegations in Paragraph 101, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

102. Walgreens' misrepresentations to Plaintiffs' PBMs and Plaintiffs began in 2007 and are ongoing. Walgreens made misrepresentations to Plaintiffs via Plaintiffs' PBMs, knowing that the fraudulently inflated U&C charges it submitted in field 426-DQ of the NCPDP form would materially impact the adjudication process and be communicated to Plaintiffs as the ultimate payor.

**ANSWER**: Defendants deny the allegations in Paragraph 102, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

103.    Because the U&C price was a payment term necessary for determining Plaintiffs' payment price, the U&C prices Walgreens reported to Plaintiffs' PBMs and Plaintiffs were material.

**ANSWER**: Defendants deny the allegations in Paragraph 103, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

104.    Walgreens knew that the cash prices that it charged PSC Program customers, JustRx Program customers, and third-party discount card customers, and other discounted prices for prescriptions were lower than the inflated U&C charges that Walgreens reported electronically to Plaintiffs' PBMs and Plaintiffs on the NCPDP form for the same drugs. Walgreens thus knew that the U&C charges it represented were false and misleading.

**ANSWER**: Defendants admit that some prices available to PSC Program members were lower than some U&C prices that Walgreens reported to Plaintiffs' PBMs with Walgreens' reimbursement claims. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

105.    Walgreens submitted inflated U&C prices on claims for payment by Plaintiffs with the knowledge and intent that those false U&C prices would be relied upon to adjudicate Plaintiffs' payments, to the benefit of Walgreens. Specifically, through this fraudulent scheme, Walgreens intended to gain reimbursement payments in amounts far greater than it was entitled.

**ANSWER**: Defendants deny the allegations in Paragraph 105, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

106.     Plaintiffs lacked the ability to discover Walgreens' fraud.  Plaintiffs had no means to identify how many Walgreens customers were actually paying PSC Program prices, JustRx Program prices, third-party discount card program prices, or other discount prices; or to identify the precise list of drugs discounted by those programs; or to identify the prices at which all of those discounted drugs were offered to Walgreens' cash customers.

**ANSWER**: Defendants deny the allegations in Paragraph 106, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

107.     Plaintiffs justifiably relied on the accuracy of the pricing information that Walgreens reported in NCPDP field 426-DQ.

**ANSWER**: Defendants lack knowledge or information sufficient to form a belief as to what pricing information Plaintiffs relied upon.

108.     As a result of Walgreens' fraudulent conduct and Plaintiffs' justifiable reliance, Plaintiffs have sustained immense damage.  Plaintiffs have overpaid millions of dollars to Walgreens.  In addition, Walgreens' fraudulent conduct has prevented Plaintiffs from obtaining more favorable prescription drug prices for their Members.

**ANSWER**: Defendants deny the allegations in Paragraph 108, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

109.     Walgreens' false and misleading conduct is ongoing:  Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

**ANSWER**: Defendants admit that, as of the date of the Complaint's filing, Walgreens continues to submit to Plaintiffs' PBMs reimbursement claims for prescription drugs sold to Plaintiffs' members; that such reimbursement claims typically document the drug's U&C price; and that Plaintiffs continue to reimburse those claims despite knowing all pertinent details of

Walgreens' price-reporting practices. Defendants specifically deny that WBA submitted any information, including U&C charges, to Plaintiffs or their PBMs. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

110.    Plaintiffs are entitled to recover damages against Walgreens based on fraud in an amount to be determined at trial.

**ANSWER**: Defendants deny the allegations in Paragraph 110.

## SECOND CLAIM FOR RELIEF (COUNT II)
## FRAUDULENT NONDISCLOSURE

111.    Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 99 above.

**ANSWER**: Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding Paragraphs as if fully set forth herein.

112.    Walgreens had special knowledge of material facts, *i.e.*, the accurate, non-inflated U&C prices, which the Plaintiffs do not have.

**ANSWER**: Defendants deny the allegations in Paragraph 112, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

113.    Walgreens concealed material facts, *i.e.*, the accurate, non-inflated U&C prices, from Plaintiffs' PBMs and Plaintiffs.

**ANSWER**: Defendants deny the allegations in Paragraph 113, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

114.    Walgreens knew what the accurate, non-inflated U&C prices were for the prescription drugs for which it submitted claims for reimbursement from Plaintiffs' PBMs and Plaintiffs.  These prices were the same or similar prices Walgreens was charging its customers

using the PSC Program, JustRx Program, third-party discount programs, or through other discounts to purchase the same prescription drugs.

**ANSWER**: Defendants deny the allegations in Paragraph 114, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

115.    Walgreens knew that it was not submitting the accurate, non-inflated U&C prices for reimbursement from Plaintiffs' PBMs and Plaintiffs.

**ANSWER**: Defendants deny the allegations in Paragraph 115, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

116.    Walgreens knew or should have known that Plaintiffs' PBMs and Plaintiffs would rely upon Walgreens' concealment of the accurate, non-inflated U&C prices to adjudicate Walgreens' claims for reimbursement.

**ANSWER**: Defendants deny the allegations in Paragraph 116, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

117.    Walgreens had a duty to disclose the accurate, non-inflated, true U&C prices. Walgreens had special knowledge of the complete list of drugs, drug prices, discounts, and cash transaction data necessary to determine the accurate, non-inflated, true U&C prices.  Plaintiffs could not determine the true U&C price because this information was hidden by Walgreens and not available to Plaintiffs.

**ANSWER**: Defendants deny the allegations in Paragraph 117, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

118.    As a result of Walgreens' fraudulent nondisclosure, Plaintiffs have sustained immense damage in the form of overpayments to Walgreens totaling millions of dollars. In

addition, Walgreens' fraudulent conduct has prevented Plaintiffs from obtaining more favorable prescription drug prices for their members.

**ANSWER**: Defendants deny the allegations in Paragraph 118, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

119. Walgreens' fraudulent conduct is ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.

**ANSWER**: Defendants deny the allegations in Paragraph 119, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

120. Plaintiffs are entitled to recover damages against Walgreens based on its fraudulent nondisclosures in an amount to be determined at trial.

**ANSWER**: Defendants deny the allegations in Paragraph 120, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

### THIRD CLAIM FOR RELIEF (COUNT III)
### UNJUST ENRICHMENT

121. Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 99 above.

**ANSWER**: Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding Paragraphs as if fully set forth herein.

122. Under the circumstances described herein, Walgreens has owed—and continues to owe—a duty to Plaintiffs to provide Plaintiffs with accurate U&C prices on reimbursement claims.

**ANSWER**: Defendants deny the allegations in Paragraph 122, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

123. Because Walgreens fraudulently inflated the U&C prices it reported on millions of claims submitted for Plaintiffs' reimbursement, Plaintiffs were overcharged, and thus overpaid millions of dollars to Walgreens.

**ANSWER**: Defendants deny the allegations in Paragraph 123, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

124. Walgreens knowingly and voluntarily accepted these millions of dollars in overpayments from Plaintiffs.

**ANSWER**: Defendants deny the allegations in Paragraph 124, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

125. Plaintiffs' overpayments should not have been paid to Walgreens. Those millions of dollars in overpayments should have been retained by Plaintiffs.

**ANSWER**: Defendants deny the allegations in Paragraph 125, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

126. Walgreens' retention of these overpayment amounts violates fundamental principles of justice, equity, and good conscience.

**ANSWER**: Defendants deny the allegations in Paragraph 126, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

127. Under the circumstances described herein, it would be inequitable for Walgreens to retain these overpayments.

**ANSWER**: Defendants deny the allegations in Paragraph 127, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

128. As a result of Walgreens' wrongful conduct as described herein, Walgreens has been unjustly enriched at the expense of, and to the detriment of, Plaintiffs.

**ANSWER**: Defendants deny the allegations in Paragraph 128, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

129.    Walgreens is therefore liable to Plaintiffs for restitution in the amount of Walgreens' wrongfully obtained monies.

**ANSWER**: Defendants deny the allegations in Paragraph 129, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**FOURTH CLAIM FOR RELIEF (COUNT IV)**
**VIOLATION OF THE ILLINOIS UNIFORM**
**DECEPTIVE TRADE PRACTICES ACT (815 ILCS 510, *ET SEQ.*)**

130.    Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 99 above.

**ANSWER**: Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding Paragraphs as if fully set forth herein.

131.    Walgreens' business acts and practices alleged herein constitute deceptive trade practices under the Illinois Uniform Deceptive Trade Practices Act ("IUDTPA").

**ANSWER**: Defendants deny the allegations in Paragraph 131, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

132.    Each Plaintiff and each Defendant is, and at all relevant or material times was, a "person" as defined in IUDTPA.[46]

**ANSWER**: Defendants deny the allegations in Paragraph 132, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

---

[46] *See* 815 ILCS 510/1(2) ("'[P]erson' means an individual, corporation, government or governmental subdivision or agency, business trust, estate, trust, partnership, unincorporated association, 2 or more of any of the foregoing having a joint or common interest or any other legal or commercial entity.").

**133.** Walgreens' deceptive trade practices included, but were not limited to: (i) making false and misleading statements of fact concerning the reasons for, existence of, or amounts of price reductions; and (ii) engaging in conduct which similarly created a likelihood of confusion or misunderstanding.

**ANSWER**: Defendants deny the allegations in Paragraph 133, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**134.** At all material and relevant times, Walgreens' wrongful acts occurred in the course of its "business, vocation, or occupation" as described in IUDTPA.[47]

**ANSWER**: Defendants deny the allegations in Paragraph 134, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**135.** At all material and relevant times, the circumstances related to Walgreens' wrongful acts occurred primarily and substantially in Illinois. Walgreens has administered, and continues to administer, its PSC Program from Walgreens' corporate headquarters in Deerfield, Illinois. The decisions to not report its discounted prices as U&C to Plaintiffs and to conceal that decision from Plaintiffs were made by Walgreens' senior management in and implemented out of Illinois. Walgreens has also issued statements from senior officials and made other representations about the PSC Program from and in the course of its Illinois operation which contributed to the fraud, concealment, and deception. Further, WHI, which was Walgreen Co.'s wholly-owned subsidiary PBM during the initial years of Walgreens' fraudulent scheme, was at that time based in and operated out of Illinois. In Illinois, WHI created and published a false policy regarding Walgreens' reporting of discounted prices through its Pharmacy Manual, which contained a U&C definition consistent with the NCPDP requirements and industry standards, and disseminated that

---

[47] 815 ILCS 510/2.

false policy from Illinois. Through its scheme, Walgreens secured hundreds of millions of dollars in payments from Plaintiffs, and these payments were sent to Walgreens' headquarters in Illinois. Walgreens' PBM agreements were negotiated by Walgreens in Illinois. And members of each of Plaintiffs' health plans have purchased prescription drugs from Walgreens in Illinois.

**ANSWER**: Defendants admit that Walgreens' corporate headquarters are in Deerfield, Illinois, and that employees who worked at Walgreens' corporate headquarters were involved in creating PSC. Defendants deny that WBA operates or administers PSC. Defendants admit that Walgreens Health Initiatives, Inc. was a wholly-owned subsidiary of Walgreens until 2011, and at that time was a PBM based in Illinois. Defendants respectfully refer the Court to the WHI Pharmacy Manual for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants lack knowledge or information sufficient to form a belief as to the allegations in the last sentence of this Paragraph 135. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

136. Walgreens represented that the prices it reported in NCPDP field 426-DQ were Walgreens' true and accurate U&C prices. Walgreens' representations were false, and Walgreens' true and accurate U&C prices for the prescription drugs for which it sought reimbursement from Plaintiffs' PBMs and Plaintiffs were lower than the prices quoted by Walgreens.

**ANSWER**: Defendants admit that any prices that Walgreens reported in the NCPDP field 426-DQ were Walgreens' true and accurate U&C prices. Defendants deny that WBA reported any prices for prescription drugs. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

137.    The true and accurate U&C prices for the prescription drugs for which Walgreens sought reimbursement were the actual prices at which the prescription drugs were regularly and customarily sold at retail by Walgreens, inclusive of any prices offered to customers paying without insurance who participated in the PSC Program, JustRx Program, third-party discount card programs, or received other discounts.

**ANSWER**: Defendants deny the allegations in Paragraph 137, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

138.    Walgreens actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs. As a result, Plaintiffs face the threat of future harm.

**ANSWER**: Defendants admit that, as of the date of the Complaint's filing, Walgreens continues to submit to Plaintiffs' PBMs reimbursement claims for prescription drugs sold to Plaintiffs' members; that such reimbursement claims typically document the drug's U&C price; and that Plaintiffs continue to reimburse those claims despite knowing all pertinent details of Walgreens' price-reporting practices. Defendants specifically deny that WBA submitted any information, including U&C charges, to Plaintiffs or their PBMs. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

139.    Walgreens' deceptive practices regarding its true U&C prices of drugs discounted by the PSC Program (and other similar programs) injured both Plaintiffs and their Members, including those based in Illinois. Walgreens' misconduct was and continues to be directed at and impacts the market generally and otherwise implicates consumer protection concerns, and

remedying Walgreens' wrongdoing through the relief requested herein would serve the interests of consumers.

**ANSWER**: Defendants deny the allegations in Paragraph 139, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

140.    Because Walgreens continues its U&C overcharging conduct described in this Complaint, Plaintiffs are likely to be damaged by Walgreens' continued deceptive trade practices. Consequently, Plaintiffs seek injunctive relief, pursuant to 815 ILCS 510/3, to enjoin Walgreens from excluding PSC Program prices, JustRx Program prices, third-party discount card program prices, and other discounts from the U&C prices it reports on claims for Plaintiffs' reimbursement.

**ANSWER**: Defendants admit that Plaintiffs purport to seek injunctive relief pursuant to 815 ILCS 510/3, but Defendants specifically deny that Plaintiffs are entitled to such relief. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

141.    Because Walgreens has willfully engaged in the deceptive trade practices described in this complaint, Plaintiffs are entitled to recover attorneys' fees and costs of suit.

**ANSWER**: Defendants deny the allegations in Paragraph 141, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

### FIFTH CLAIM FOR RELIEF (COUNT V)
### VIOLATION OF THE ILLINOIS CONSUMER FRAUD AND
### DECEPTIVE BUSINESS PRACTICES ACT (815 ILCS 505, *ET SEQ.*)

142.    Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 99 above.

**ANSWER**: Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding Paragraphs as if fully set forth herein.

**143.** Walgreens' business acts and practices alleged herein constitute unfair, unconscionable, deceptive, and fraudulent acts or practices under the Illinois Consumer Fraud and Deceptive Business Practices Act ("ICFA").

**ANSWER**: Defendants deny the allegations in Paragraph 143, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**144.** Each Plaintiff and each Defendant is, and at all relevant or material times was, a "person" as defined in ICFA.[48]

**ANSWER**: Defendants deny the allegations in Paragraph 144, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**145.** At all material and relevant times, the circumstances related to Walgreens' wrongful acts occurred primarily and substantially in Illinois. Walgreens has administered, and continues to administer, its PSC Program from Walgreens' corporate headquarters in Deerfield, Illinois. The decisions to not report its discounted prices as U&C to Plaintiffs and to conceal that decision from Plaintiffs were made by Walgreens' senior management in and implemented out of Illinois. Walgreens has also issued statements from senior officials and made other representations about the PSC Program from and in the course of its Illinois operation which contributed to the fraud, concealment, and deception. Further, WHI, which was Walgreen Co.'s wholly-owned subsidiary PBM during the initial years of Walgreens' fraudulent scheme, was at that time based in and operated out of Illinois. In Illinois, WHI created and published a false policy regarding Walgreens' reporting of discounted prices through its Pharmacy Manual, which contained a U&C definition consistent with the NCPDP requirements and industry standards, and disseminated that

---

[48] *See* 815 ILCS 505/1(c) ("The term 'person' includes[, *inter alia*,] any natural person or his legal representative, partnership, corporation (domestic and foreign), company, trust, business entity or association.").

false policy from Illinois.  Through its scheme, Walgreens secured hundreds of millions of dollars in payments from Plaintiffs, and these payments were sent to Walgreens' headquarters in Illinois. Walgreens' PBM agreements were negotiated by Walgreens in Illinois.  And members of each of Plaintiffs' health plans have purchased prescription drugs from Walgreens in Illinois.

**ANSWER**: Defendants admit that Walgreens' corporate headquarters is in Deerfield, Illinois, and that employees who worked at Walgreens' corporate headquarters were involved in creating PSC. Defendants deny that WBA operates or administers PSC. Defendants admit that Walgreens Health Initiatives, Inc. was a wholly-owned subsidiary of Walgreens until 2011, and at that time was a PBM based in Illinois. Defendants respectfully refer the Court to the WHI Pharmacy Manual for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants lack knowledge or information sufficient to form a belief as to the allegations in the last sentence of this Paragraph. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

146.    Because Plaintiffs suffered actual damage as a result of Walgreens' ICFA violations, Plaintiffs are statutorily authorized to bring a private action to recover actual economic damages, reasonable attorney's fees, and litigation costs, and to secure injunctive relief against Defendants.

**ANSWER**: Defendants deny the allegations in Paragraph 146, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

147.    Defendants engaged in unfair, deceptive, and unlawful acts and practices, including the employment of deception, fraud, false pretenses, misrepresentations to Plaintiffs, and the concealment, suppression and omission of material facts from Plaintiffs, with the specific intent

that the Plaintiffs would rely upon those deceptive acts and practices to reimburse claims to Walgreens.

**ANSWER**: Defendants deny the allegations in Paragraph 147, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

148.    At all material and relevant times, Walgreens' wrongful acts occurred in the course of its business and in the conduct of trade and commerce, as defined by ICFA.[49] Walgreens' unfair, unlawful, and deceptive acts and practices alleged herein regarding its true U&C prices occurred during and related directly to the routine purchase, sale, and reimbursement of prescription drugs at Walgreens pharmacies.

**ANSWER**: Defendants admit that the Walgreens conduct described in the Complaint occurred in the course of its business and in the conduct of trade and commerce. Defendants specifically deny that such conduct was "wrongful," "unfair," "deceptive," or "unlawful" or that WBA engaged or participated in that conduct. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

149.    Further, Walgreens marketed, promoted, advertised, and distributed the PSC Program cards, JustRx Program cards, other third-party discount program cards, and marketing materials in conjunction with PSC Program, JustRx Program, and third-party discount program cards, that "purport[ed] to offer discounts or access to discounts from health care providers in health related purchases," but the "the discounts or access to discounts offered or the range of discounts or access to the range of discounts offered," and Walgreens' intent for offering those discounts, were misleading, deceptive, and fraudulent.[50]

---

[49] 815 ILCS 505/2.
[50] 815 ILCS 505/2B.3.

**ANSWER**: Defendants admit that Walgreens publicly and prominently advertised, marketed, and promoted the PSC Program in advertising materials broadly and publicly distributed. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

150.    Walgreens displayed price quotations through submission of claims for reimbursement for prescription drugs to Plaintiffs' PBMs and Plaintiffs. Walgreens' price quotations were included in NCPDP field 426-DQ of its claims for reimbursement.

**ANSWER**: Defendants admit that Walgreens reported pricing data (including the U&C price) when submitting to Plaintiffs' PBMs reimbursement claims for prescription drugs sold to Plaintiffs' members. Defendants admit that Walgreens typically reported its U&C prices. Defendants specifically deny that Walgreens displayed or submitted pricing data to Plaintiffs. Defendants specifically deny that WBA reported or displayed any price quotations or other pricing data for prescription drugs. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

151.    Walgreens represented that its price quotations included in NCPDP field 426-DQ were U&C prices. Walgreens' representations were false, and Walgreens' true and accurate U&C prices for the prescription drugs for which it sought reimbursement from Plaintiffs' PBMs and Plaintiffs were lower than the prices quoted by Walgreens.

**ANSWER**: Defendants admit that any prices that Walgreens reported in the NCPDP field 426-DQ were Walgreens' true and accurate U&C prices. Defendants deny that WBA reported any prices for prescription drugs. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

**152.**    The true and accurate U&C prices for the prescription drugs for which Walgreens sought reimbursement were the actual prices at which the prescription drugs were regularly and customarily sold at retail by Walgreens, inclusive of any prices offered to customers paying without insurance who participated in the PSC Program, JustRx Program, third-party discount card programs, or received other discounts.

**ANSWER**: Defendants deny the allegations in Paragraph 152, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**153.**    In addition to Plaintiffs, Walgreens' fraudulent conduct impacted consumers purchasing prescription drugs from Walgreens pharmacies using insurance through increased copay, coinsurance, and deductible obligations, as well as increased premiums resulting from increased costs to Plaintiffs.  The requested relief will also serve the interests of these consumers.

**ANSWER**: Defendants deny the allegations in Paragraph 153, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**154.**    Walgreens actions are ongoing: Walgreens continues to report inflated U&C prices in NCPDP field 426-DQ for claims submitted for payment by Plaintiffs.  As a result, Plaintiffs face the threat of future harm.

**ANSWER**: Defendants admit that, as of the date of the Complaint's filing, Walgreens continues to submit to Plaintiffs' PBMs reimbursement claims for prescription drugs sold to Plaintiffs' members; that such reimbursement claims typically document the drug's U&C price; and that Plaintiffs continue to reimburse those claims despite knowing all pertinent details of Walgreens' price-reporting practices. Defendants specifically deny that WBA submitted any information, including U&C charges, to Plaintiffs or their PBMs. Defendants deny the remaining

allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

155. Walgreens' deceptive practices regarding its true U&C prices of drugs discounted by the PSC Program (and other similar programs) injured both Plaintiffs and their Members, including those based in Illinois. Walgreens' misconduct was and continues to be directed at and impacts the market generally and otherwise implicates consumer protection concerns, and remedying Walgreens' wrongdoing through the relief requested herein would serve the interests of consumers.

**ANSWER**: Defendants deny the allegations in Paragraph 155, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

156. Walgreens' acts, omissions, and practices, as described herein, proximately caused Plaintiffs to suffer actual damages in the form of, *inter alia*, overpaying reimbursements on at least millions of prescription claims. Pursuant to 815 ILCS 505/10a, Plaintiffs are entitled to the amount of the actual economic damages resulting from Walgreens' unlawful trade practices.

**ANSWER**: Defendants deny the allegations in Paragraph 156, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

157. Plaintiffs also seek injunctive relief, pursuant to 815 ILCS 505/10a(c), to enjoin Walgreens from excluding PSC Program prices, JustRx Program prices, third-party discount card program prices, and other discounted prices from the U&C prices it reports on claims for Plaintiffs' reimbursement.

**ANSWER**: Defendants admit that Plaintiffs purport to seek injunctive relief pursuant to 815 ILCS 505/10a(c), but Defendants specifically deny that Plaintiffs are entitled to such relief.

Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

**SIXTH CLAIM FOR RELIEF (COUNT VI)**
**VIOLATION OF MARYLAND CONSUMER PROTECTION ACT,**
**MD. COM. LAW CODE § 13-101 et seq.**
**(BROUGHT BY CFMI, GHMSI AND CAREFIRST BLUECHOICE)**

158.    Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 99 above.

**ANSWER**: Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding Paragraphs as if fully set forth herein.

159.    CFMI, GHMSI and CareFirst BlueChoice are consumers within the meaning of the Maryland Consumer Protection Act, Md. Code Ann., Com. Law § 13-101 et seq. ("MCPA") who transacted with Walgreens through CFMI's, GHMSI's and CareFirst BlueChoice's insured members' purchase of generic prescription drugs.

**ANSWER**: Defendants deny the allegations in Paragraph 159, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

160.    Defendants are persons and merchants within the meaning of MCPA § 13-101(g), (h).

**ANSWER**: Defendants deny the allegations in Paragraph 160, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

161.    The MCPA was "intended to provide minimum standards for the protection of consumers in the State." § 13-101.

**ANSWER**: Defendants deny that Paragraph 161 accurately quotes MCPA § 13-101. Defendants deny any remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

**162.** Among other things, the MCPA prohibits unfair and deceptive trade practices "in the sale, lease, rental, loan, or bailment of any consumer goods, consumer realty, consumer services... ." MCPA § 13-303(1).

**ANSWER**: Defendants respectfully refer the Court to MCPA § 13-303(1) for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

**163.** Deceptive trade practices include "[d]eception, fraud, false pretense, false premise, misrepresentation, or knowing concealment, suppression, or omission of any material fact with the intent that the consumer relies on the same in connection with… the promotion or sale of any consumer goods… or consumer service[.]" MCPA § 13-301.

**ANSWER**: Defendants respectfully refer the Court to MCPA § 13-301 for its true and complete contents, and Defendants deny any allegations inconsistent therewith. Defendants deny any remaining allegations in this Paragraph, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**164.** Walgreens has engaged in unfair, abusive or deceptive trade practices against CFMI, GHMSI and CareFirst BlueChoice within the meaning of, and in violation of, the MCPA by engaging in deception, fraud, false pretense, false premise, misrepresentation, knowing concealment, suppression, and omission regarding the true U&C price for prescription drugs.

**ANSWER**: Defendants deny the allegations in Paragraph 164, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**165.** Defendants violated MCPA § 13-301(3) by failing to state a material fact, a failure which deceives to tends to deceive. As alleged herein, Walgreens' conduct and nondisclosures

were false, misleading and likely to deceive CFMI, GHMSI and CareFirst BlueChoice in violation of the MCPA.

**ANSWER**: Defendants deny the allegations in Paragraph 165, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

166.    Walgreens engaged in these unfair and deceptive trade practices in connection with the offering for sale of consumer goods in violation of MCPA § 13-303.

**ANSWER**: Defendants deny the allegations in Paragraph 166, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

167.    Walgreens' representations or omissions were material because they were likely to, and in fact did, deceive CFMI. GHMSI and CareFirst BlueChoice.

**ANSWER**: Defendants deny the allegations in Paragraph 167, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

168.    Walgreens intended to mislead CFMI, GHMSI and CareFirst BlueChoice and induce CFMI, GHMSI and CareFirst BlueChoice to rely on Walgreens' representations and omissions.

**ANSWER**: Defendants deny the allegations in Paragraph 168, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

169.    CFMI, GHMSI and CareFirst BlueChoice would not have paid Walgreens' inflated prices for prescription drugs if nor for Walgreens' deception, fraud, false premise, misrepresentation, knowing concealment, suppression, and/or omission regarding the true U&C price.

**ANSWER**: Defendants deny the allegations in Paragraph 169, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

170.    As a direct and proximate result of Walgreens' unlawful, unfair, deceptive and fraudulent conduct in violation of the MCPA, CFMI, GHMSI and CareFirst BlueChoice suffered injury in fact in the form of paying Walgreens' inflated prices.

**ANSWER**: Defendants deny the allegations in Paragraph 170, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

171.    CFMI, GHMSI and CareFirst BlueChoice seek all monetary and non-monetary relief allowed by law, including damages, disgorgement, and attorneys' fees and costs.

**ANSWER**: Defendants admit that Plaintiffs purport to seek monetary and non-monetary relief, but Defendants specifically deny that Plaintiffs are entitled to such relief. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

### SEVENTH CLAIM FOR RELIEF (COUNT VII)
### VIOLATION OF VIRGINIA CONSUMER PROTECTION ACT,
### VA. CODE §§ 59.1-200
### (BROUGHT BY GHMSI AND CAREFIRST BLUECHOICE)

172.    Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 99 above.

**ANSWER**: Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding Paragraphs as if fully set forth herein.

173.    The transactions for prescription drugs made by GHMSI and CareFirst BlueChoice on behalf of their Members were "consumer transactions" within the meaning of the Virginia Consumer Protection Act ("VCPA"), Va. Code § 59.1-198.

**ANSWER**: Defendants deny the allegations in Paragraph 173, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

174.    Defendants are "suppliers" within the meaning of VCPA § 59.1-198.

**ANSWER**: Defendants deny the allegations in Paragraph 174, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

175.    GHMSI and CareFirst BlueChoice are each a "person" within the meaning of VCPA § 59.1-198.

**ANSWER**: Defendants deny the allegations in Paragraph 175, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

176.    Walgreens used deception, fraud, false pretense, false promise, and misrepresentation in connection with consumer transactions by, in the course of selling generic prescription drugs, misrepresenting the true prices paid by cash customers and inflating the U&C price for those prescription drugs, in violation of VCPA § 59.1-200.

**ANSWER**: Defendants deny the allegations in Paragraph 176, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

177.    Walgreens' deceptions and misrepresentations were material because they were intended to, and in fact did, deceive GHMSI and CareFirst BlueChoice in connection with consumer transactions.

**ANSWER**: Defendants deny the allegations in Paragraph 177, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

178.    Walgreens intended to deceive GHMSI and CareFirst BlueChoice, and to misrepresent the true U&C prices for prescription drugs.

**ANSWER**: Defendants deny the allegations in Paragraph 178, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

179.     Walgreens knew, or should have known, that GHMSI and CareFirst BlueChoice would rely on these misrepresentations and, as a result, would pay inflated reimbursements above Walgreens' true U&C prices.

**ANSWER**: Defendants deny the allegations in Paragraph 179, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

180.     As a result of Walgreens' deception and misrepresentations, GHMSI and CareFirst BlueChoice did pay the artificially inflated reimbursements to Defendants.

**ANSWER**: Defendants deny the allegations in Paragraph 180, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

181.     Each of Walgreens' violations of the VCPA were done willfully, entitling GHMSI and CareFirst BlueChoice to their actual damages, statutory damages, and exemplary damages under VCPA § 59.1-204.

**ANSWER**: Defendants deny the allegations in Paragraph 181, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**EIGHTH CLAIM FOR RELIEF (COUNT VIII)**
**VIOLATION OF THE SOUTH CAROLINA UNFAIR TRADE PRACTICES ACT**
**(S.C. CODE ANN. § 39-5-10, ET SEQ.)**
**(BROUGHT BY BCBSSC AND BCHPSC)**

182.     Plaintiffs incorporate and repeat the allegations set forth in Paragraphs 1 through 99 above.

**ANSWER**: Defendants repeat, incorporate, and reallege their answers to the allegations in the preceding Paragraphs as if fully set forth herein.

183.     Walgreens' business acts and practices alleged herein constitute unfair or deceptive acts or practices in the conduct of trade or commerce under South Carolina Unfair Trade Practices Act ("SCUTPA"), S.C. Code Ann. § 39-5-10, et seq.

**ANSWER**: Defendants deny the allegations in Paragraph 183, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

184.     BCBSSC and BCHPSC, and each Defendant is, and at relevant and material times was, a "person" as defined in the SCUPTA.[51]

**ANSWER**: Defendants deny the allegations in Paragraph 184, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

185.     Walgreens' business acts and practices, as alleged herein, violate SCUPTA, for the following reasons:

        a.     Walgreens engaged in unfair and deceptive commercial practices in failing to reveal material facts and information about Walgreens' true U&C prices, which mislead BCBSSC and BCHPSC about facts that could not reasonably be known to BCBSSC and BCHPSC;

        b.     Walgreens failed to reveal facts that were material to the transactions at issue in light of representations of fact made in a positive manner;

        c.     Walgreens failed to reveal material facts about Walgreens' true U&C prices to BCBSSC and BCHPSC with the intent that BCBSSC and BCHPSC would rely upon those omissions; and

        d.     Walgreens made material representations and statements of fact to BCBSSC and BCHPSC that resulted in BCBSSC and BCHPSC reasonably believing the represented or suggested state of affairs to be other than what they actually were.

**ANSWER**: Defendants deny the allegations in Paragraph 185, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

---

[51] *See* S.C. Code Ann. § 39-5-10.

**186.** Walgreens intended that BCBSSC and BCHPSC rely on their misrepresentations and omissions, so that BCBSSC and BCHPSC would reimburse millions of claims at inflated rates.

**ANSWER**: Defendants deny the allegations in Paragraph 186, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**187.** Had BCBSSC and BCHPSC known Walgreens' true U&C prices, BCBSSC and BCHPSC would have paid millions of dollars less for the reimbursement of claims submitted by Walgreens.

**ANSWER**: Defendants deny the allegations in Paragraph 187, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**188.** Walgreens' actions cause a likelihood of confusion or misunderstanding regarding the true and accurate U&C prices for the prescription drugs dispensed to BCBSSC's and BCHPSC's members.

**ANSWER**: Defendants deny the allegations in Paragraph 188, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**189.** Due to Walgreens' wrongdoing, BCBSSC and BCHPSC suffered an ascertainable loss of monies that was caused by Walgreens' actions.

**ANSWER**: Defendants deny the allegations in Paragraph 189, except they neither admit nor deny the allegations to the extent they consist of legal conclusions.

**190.** Walgreens' acts, omissions, and practices, as described herein, caused BCBSSC and BCHPSC to suffer ascertainable loss of monies and suffer actual damages in the form of, *inter alia*, overpaying reimbursements on millions of prescription claims. Consequently, BCBSSC and BCHPSC seek actual damages, pursuant to S.C. Code Ann. § 39-5-140.

**ANSWER**: Defendants admit that Plaintiffs purport to seek actual damages pursuant to S.C. Code Ann. § 39-5-140, but Defendants specifically deny that Plaintiffs are entitled to such relief. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

191.    Walgreens' acts, omissions, and practices, as described herein, were conducted willfully and knowingly. Consequently, BCBSSC and BCHPSC seek three times their actual damages, attorneys' fees and costs of suit, as well as any other relief as the Court deems necessary or proper, pursuant to S.C. Code Ann. § 39-5-140.

**ANSWER**: Defendants admit that Plaintiffs purport to seek three times their actual damages, attorneys' fees, and costs of suit pursuant to S.C. Code Ann. § 39-5-140, but Defendants specifically deny that Plaintiffs are entitled to such relief. Defendants deny the remaining allegations in this Paragraph, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

## NOTICE TO STATE ATTORNEYS GENERAL

Pursuant to applicable statutory provisions, a copy of this Complaint has been mailed to the Offices of the Attorney General of Illinois with the filing of this Complaint. Upon entry or judgment or order in this action, a copy of such judgment or order will also be mailed to the Office of the Attorney General of Illinois.

**ANSWER:** Defendants lack knowledge or information sufficient to form a belief as to whether Plaintiffs have mailed a copy of this Complaint to the Offices of the Attorney General of Illinois. Defendants deny the remaining allegations in these Paragraphs, except Defendants neither admit nor deny the allegations to the extent they consist of legal conclusions.

## **<u>PRAYER</u>**

WHEREFORE, Defendants deny that Plaintiffs are entitled to any of the relief the Complaint seeks, and Defendants respectfully request that judgment be entered in their favor against Plaintiffs and further request that Defendants be awarded attorneys' fees and costs and such other further relief as the Court deems just and proper.

## AFFIRMATIVE DEFENSES

Defendants assert the following affirmative defenses to the claims and allegations contained in the Complaint. Defendants undertake the burden of proof as to only those defenses deemed affirmative defenses by law, regardless of how such defenses are denominated by Defendants. Defendants do not assume the burden of proof on any defenses whose proof burden would otherwise rest on Plaintiffs.

### FIRST AFFIRMATIVE DEFENSE:

### Statute of Limitations

1.      The statute of limitations for fraud and unjust enrichment claims in Illinois is five years. *See* 735 ILCS 5/13-205.

2.      The statute of limitations for claims under the Illinois Uniform Deceptive Trade Practices Act and Illinois Consumer Fraud and Deceptive Business Practices Act is three years. *See* 815 ILCS 505/10a(e).

3.      The statute of limitations for claims under the Maryland Consumer Protection Act is three years. *See* Md. Code Ann. § 5-101.

4.      The statute of limitations for claims under the Virginia Consumer Protection Act is two years. *See* Va. Code Ann. § 59.1-204.1.

5.      The statute of limitations for claims under the South Carolina Unfair Trade Practices Act is three years. *See* S.C. Code Ann. § 39-5-150.

6.      Plaintiffs' pharmacy benefit managers ("PBMs") serve as Plaintiffs' express agents in reimbursement transactions with Walgreens. Plaintiffs' PBMs adjudicate Walgreens' reimbursement claims on Plaintiffs' behalf, subject to rules and standards dictated by Plaintiffs. The PBMs then remit payment to Walgreens at Plaintiffs' direction, and Plaintiffs are ultimately responsible for reimbursing Walgreens for their insureds' individual prescriptions.

7.      Plaintiffs' PBMs have long known about the Prescription Savings Club ("PSC") and other pharmacy and third-party discount clubs, and they have long known that pharmacies did not include PSC and other discount club prices in U&C prices. Indeed, in other litigation related to U&C prices dating back more than a decade, Plaintiffs' PBMs have given sworn statements confirming their knowledge and acceptance of the pharmacies' practice of excluding discount club prices from U&C prices.

8.      Because Plaintiffs' PBMs are Plaintiffs' agents, the PBMs' knowledge is imputed by law to Plaintiffs. As a result, Plaintiffs have known the bases for their causes of action for many years through their chosen agents, the PBMs.

9.      Plaintiffs also directly knew or should have known the bases for their causes of action many years ago as a result of, among other reasons, Walgreens' extensive public advertisements of PSC and of PSC's enrollment criteria, formulary, and prices.

10.      Beginning in 2007, Walgreens widely advertised PSC through in-store brochures and signs; national and local radio ads; national and local TV ads; billboards; print advertisements in magazines and circulars; TV talk shows; healthcare and finance blogs; the Walgreens website; and even messages on Walgreens' receipts and plastic bags. These advertisements often included links or phone numbers for additional terms and conditions; a complete formulary or price list; and a guarantee that, if a PSC member's savings did not exceed the annual membership fee, Walgreens would provide a store credit to cover the difference.

11.      Plaintiffs also knew or should have known, based on even a cursory comparison of their reimbursement rates to Walgreens' widely advertised PSC prices (among other knowledge sources), that Walgreens excluded PSC prices from its U&C prices.

12.     Among other bases for Plaintiffs' actual or constructive knowledge of their claims, Plaintiffs also knew or should have known the bases for their causes of action, and any purportedly concealed claims accrued, no later than March 2017, when a proposed class of consumer and third-party payor plaintiffs filed *Forth v. Walgreen Co.*, No. 17-cv-2246, in this District, accusing Walgreens of improperly omitting PSC prices from U&C.

13.     Plaintiffs filed their claims on March 15, 2022.

14.     Plaintiffs' claims are thus barred in whole or in part by the statutes of limitations.

### SECOND AFFIRMATIVE DEFENSE:

### Contractual Time Bar

15.     Plaintiffs' PBMs are Plaintiffs' express agents. The PBMs adjudicate Walgreens' reimbursement claims on Plaintiffs' behalf, pursuant to criteria, rules, and standards dictated by Plaintiffs. The PBMs then remit payment to Walgreens at Plaintiffs' direction, and Plaintiffs are ultimately responsible for reimbursing Walgreens for their insureds' individual prescriptions.

16.     Plaintiffs' PBMs enter into contracts with Walgreens as Plaintiffs' express agents, on behalf of Plaintiffs, and at the direction of Plaintiffs. As a result, the PBMs' contracts with Walgreens are binding on Plaintiffs as the PBMs' principals.

17.     In addition or in the alternative, Plaintiffs are intended third-party beneficiaries of the contracts between Walgreens and the PBMs. Those contracts confer benefits on Plaintiffs, including the processing of reimbursement claims for prescriptions filled by Plaintiffs' insureds, and those contracts identify Plaintiffs as the beneficiaries of Walgreens' services filling prescriptions and the PBMs' services adjudicating claims. As a result, the PBMs' contracts with Walgreens are binding on Plaintiffs as intended third-party beneficiaries.

18.     The PBMs' contracts with Walgreens require the PBMs to make any claim of overpayment within a specified time of the reimbursement.

19.     As explained in Paragraph 7 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs' PBMs have known or should have known the bases for their alleged overpayments for many years.

20.     Plaintiffs' PBMs did not make claims of overpayment within the contractually required time limits. Because the PBMs are Plaintiffs' express agents and were acting within the scope of their actual or apparent authority, their actions are in law the actions of Plaintiffs.

21.     As a result, based on the actions of their PBM-agents, Plaintiffs' claims are barred in whole or in part by the contractual time bars in the contracts between Plaintiffs' PBM-agents and Walgreens.

22.     The time bars in the contracts between Walgreens and the PBMs also apply directly to Plaintiffs, either because they are bound by their agents' contracts, because they are intended third-party beneficiaries of those contracts, or both.

23.     As explained in Paragraphs 6 through 12 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs knew or should have known years ago about PSC; its eligibility criteria, terms and conditions, formulary, and lower prices; and Walgreens' U&C price reporting practices, which excluded PSC and other third-party discount club prices. Despite their knowledge, Plaintiffs did not make claims of overpayment within the contractually required time limits.

24.     Plaintiffs filed their claims on March 15, 2022.

25.     Based on their own actions, Plaintiffs' claims are thus barred in whole or in part by the contractual time bars in the contracts between Plaintiffs' PBM-agents and Walgreens.

### THIRD AFFIRMATIVE DEFENSE:

### <u>Voluntary Payment</u>

26.     Plaintiffs' PBMs are Plaintiffs' express agents. The PBMs adjudicate Walgreens' reimbursement claims on Plaintiffs' behalf, pursuant to criteria, rules, and standards dictated by Plaintiffs. The PBMs then remit payment to Walgreens at Plaintiffs' direction, and Plaintiffs are ultimately responsible for reimbursing Walgreens for their insureds' individual prescriptions.

27.     As explained in Paragraph 7 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs' PBMs have known or should have known the bases for their alleged overpayments for many years.

28.     Despite their knowledge of Walgreens' pricing practices, the PBMs voluntarily paid—and, to this day, voluntarily ***continue to pay***—reimbursements that Plaintiffs allege depend on Walgreens' U&C prices.

29.     Because the PBMs are Plaintiffs' express agents and were acting within the scope of their actual or apparent authority, their actions are in law the actions of Plaintiffs.

30.     As a result, based on the actions of their PBM-agents, Plaintiffs' claims are barred in whole or in part by the voluntary payment doctrine.

31.     In addition or in the alternative, the voluntary payment doctrine bars Plaintiffs' claims in whole or in part based on their own actions. As explained in Paragraphs 6 through 12 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs knew or should have known years ago about PSC; its eligibility criteria, terms and conditions, formulary, and lower prices; and Walgreens' U&C price reporting practices, which excluded PSC and other third-party discount club prices.

32.     Despite their knowledge of Walgreens' pricing practices, Plaintiffs voluntarily paid—and, to this day, voluntarily *continue to pay*—reimbursements that Plaintiffs allege depend on Walgreens' U&C prices.

33.     As a result of their own actions, Plaintiffs' claims are thus barred in whole or in part by the voluntary payment doctrine.

### FOURTH AFFIRMATIVE DEFENSE

### Agency

34.     Plaintiffs' PBMs serve as Plaintiffs' agents in reimbursement transactions with Walgreens. Plaintiffs' PBMs adjudicate Walgreens' reimbursement claims on Plaintiffs' behalf, subject to rules and standards dictated by Plaintiffs. The PBMs then remit payment to Walgreens at Plaintiffs' direction, and Plaintiffs are ultimately responsible for reimbursing Walgreens for their insureds' individual prescriptions.

35.     Plaintiffs' PBMs acted with authority of Plaintiffs in adjudicating reimbursement claims for prescriptions filled at Walgreens by Plaintiffs' members. The Plaintiffs' PBM-agents either:

a.     Had actual authority, because Plaintiffs instructed Walgreens to transmit data about a prescription reimbursement claim to Plaintiffs' PBMs and to collect co-pays based on information provided to Walgreens by Plaintiffs' PBMs, and Plaintiffs also instructed their PBMs to adjudicate reimbursement claims on their behalf; or

b.     Had apparent authority, because Walgreens reasonably believed that Plaintiffs held out their chosen PBMs as agents with the authority to adjudicate reimbursement claims on Plaintiffs' behalf, including but not limited to the authority to communicate to pharmacies the criteria applicable to reimbursement claims, including the proper definition and

content of U&C prices, and the authority to determine whether pharmacies had submitted the proper, contractually mandated data with their reimbursement claims; or

   c.  Had implied authority, because based on the facts and circumstances of the PBMs' role in reimbursement transactions, the PBM-agents had authority to adjudicate reimbursements on Plaintiffs' behalf, including but not limited to the authority to communicate to pharmacies the criteria applicable to reimbursement claims, including the proper definition and content of U&C prices, and the authority to determine whether pharmacies had submitted the proper, contractually mandated data with their reimbursement claims even if Plaintiffs had not expressly given their PBM-agents that authority.

  36.  Plaintiffs' PBMs acted within the scope of their actual, apparent, or implied authority when they knowingly accepted from Walgreens, and voluntarily reimbursed Walgreens according to, U&C prices that excluded PSC and other discount club prices.

  37.  Plaintiffs are bound by their PBM-agents' actions taken within the actual, apparent, or implied scope of their agency, and the PBMs' actions are in law the actions of Plaintiffs.

  38.  Plaintiffs' claims are thus barred in whole or in part by the doctrine of agency.

**FIFTH AFFIRMATIVE DEFENSE:**

**<u>Actual Authority</u>**

  39.  Plaintiffs' PBMs serve as Plaintiffs' agents in reimbursement transactions with Walgreens. Plaintiffs' PBMs adjudicate Walgreens' reimbursement claims on Plaintiffs' behalf, subject to rules and standards dictated by Plaintiffs. The PBMs then remit payment to Walgreens at Plaintiffs' direction, and Plaintiffs are ultimately responsible for reimbursing Walgreens for their insureds' individual prescriptions.

40.     Plaintiffs' PBMs acted with the actual authority of Plaintiffs in adjudicating reimbursement claims for prescriptions filled at Walgreens by Plaintiffs' members. The Plaintiffs' PBM-agents either:

a.      Had actual, express authority, because Plaintiffs instructed Walgreens to transmit data about a prescription reimbursement claim to Plaintiffs' PBMs and to collect co-pays based on information provided to Walgreens by Plaintiffs' PBMs, and Plaintiffs also instructed their PBMs to adjudicate reimbursement claims on their behalf; or

b.      Had actual, implied authority, because based on the facts and circumstances of the PBMs' role in reimbursement transactions, the PBM-agents had authority to adjudicate reimbursements on Plaintiffs' behalf, including but not limited to the authority to communicate to pharmacies the criteria applicable to reimbursement claims, including the proper definition and content of U&C prices, and the authority to determine whether pharmacies had submitted the proper, contractually mandated data with their reimbursement claims even if Plaintiffs had not expressly given their PBM-agents that authority.

41.     Plaintiffs' PBMs acted within the scope of their actual authority when they knowingly accepted from Walgreens, and reimbursed Walgreens according to, U&C prices that excluded PSC and other discount club prices.

42.     Plaintiffs are bound by their PBM-agents' actions taken within the actual scope of their agency.

43.     Plaintiffs' claims are thus barred in whole or in part by the doctrine of actual authority.

## SIXTH AFFIRMATIVE DEFENSE:

### Apparent Authority

44.     Plaintiffs' PBMs serve as Plaintiffs' express agents in reimbursement transactions with Walgreens, and they have actual authority to adjudicate reimbursement claims on Plaintiffs' behalf.

45.     But even if Plaintiffs had not actually authorized their PBM-agents to adjudicate reimbursement claims on their behalf, Plaintiffs held out their chosen PBMs as agents with the authority to adjudicate reimbursement claims on Plaintiffs' behalf, including but not limited to the authority to communicate to pharmacies the criteria applicable to reimbursement claims, including the proper definition and content of U&C prices, and the authority to determine whether pharmacies had submitted the proper, contractually mandated data with their reimbursement claims.

46.     Walgreens, having exercised diligence and discretion, reasonably believed that, based on Plaintiffs' conduct, when Plaintiffs' PBMs knowingly accepted from Walgreens, and knowingly reimbursed Walgreens according to, U&C prices that excluded PSC and other discount club prices, Plaintiffs' PBMs were acting within the scope of their authority as Plaintiffs' agents. Walgreens did not know and should not have known that the PBMs were not acting within the scope of their agency when they accepted U&C prices that excluded PSC prices.

47.     Because the PBMs voluntarily paid Walgreens, knowing that Walgreens excluded PSC prices from U&C prices, the PBMs could not bring claims against Walgreens.

48.     Plaintiffs are bound by their PBM-agents' actions taken within the apparent scope of their agency.

49.     Plaintiffs' claims are thus barred in whole or in part by the doctrine of apparent authority.

## SEVENTH AFFIRMATIVE DEFENSE:

### Waiver

50.     Plaintiffs' PBMs are Plaintiffs' express agents. The PBMs adjudicate Walgreens' reimbursement claims on Plaintiffs' behalf, pursuant to criteria, rules, and standards dictated by Plaintiffs. The PBMs then remit payment to Walgreens at Plaintiffs' direction, and Plaintiffs are ultimately responsible for reimbursing Walgreens for their insureds' individual prescriptions.

51.     As explained in Paragraph 7 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs' PBMs have known or should have known the bases for their alleged overpayments for many years.

52.     Plaintiffs' PBMs also knew that they had the right to audit Walgreens' reported U&C prices and reimbursement claims if they suspected irregularities or inaccuracies.

53.     Plaintiffs' PBMs knowingly waived any rights they might have had to recover alleged overpayments by, among other actions, (a) paying Walgreens' reimbursement claims and (b) declining for over a decade to exercise their contractual rights to audit Walgreens' reimbursement claims (including but not limited to Walgreens' reported U&C prices) if they suspected irregularities or inaccuracies.

54.     Because the PBMs are Plaintiffs' express agents and were acting within the scope of their actual or apparent authority, their actions are in law the actions of Plaintiffs.

55.     As a result, based on the actions of their PBM-agents, Plaintiffs' claims are barred in whole or in part by the doctrine of waiver.

56.     In addition or in the alternative, the doctrine of waiver bars Plaintiffs' claims in whole or in part based on their own actions. As explained in Paragraphs 6 through 12 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs knew or should have known years ago about PSC; its eligibility criteria, terms

and conditions, formulary, and lower prices; and Walgreens' U&C price reporting practices, which excluded PSC and other third-party discount club prices.

57.     Indeed, Plaintiffs waited to file their suit until two years after the first of the plaintiffs in the consolidated action *BCBSM Inc., et al. v. Walgreen Co., et al.*, No. 1:20-cv-01853 (N.D. Ill.) ("*BCBSM* Action"), had filed a nearly identical suit against Defendants.

58.     Plaintiffs knowingly waived any rights they might have had to recover alleged overpayments by, among other actions, (a) paying Walgreens' reimbursement claims and (b) declining for over a decade to exercise their contractual rights to audit, through their PBM-agents, Walgreens' reimbursement claims (including but not limited to Walgreens' reported U&C prices) if they suspected irregularities or inaccuracies.

59.     Based on their own actions, Plaintiffs' claims are thus barred in whole or in part by the doctrine of waiver.

### EIGHTH AFFIRMATIVE DEFENSE:

#### <u>Acquiescence</u>

60.     Plaintiffs' PBMs are Plaintiffs' express agents. The PBMs adjudicate Walgreen's reimbursement claims on Plaintiffs' behalf, pursuant to criteria, rules, and standards dictated by Plaintiffs. The PBMs then remit payment to Walgreens at Plaintiffs' direction, and Plaintiffs are ultimately responsible for reimbursing Walgreens for their insureds' individual prescriptions.

61.     As explained in Paragraph 7 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs' PBMs have known or should have known the bases for their alleged overpayments for many years.

62.     Plaintiffs' PBMs also knew that they had the right to audit Walgreens' reported U&C prices and reimbursement claims if they suspected irregularities or inaccuracies.

63.    Based on Plaintiffs' PBMs' lack of any objections, challenges, or audits to Walgreens' pricing practices, which they knew excluded PSC and other discount club prices from U&C, their negotiation of new contracts with Walgreens that incorporated the same or similar U&C definitions, and the PBMs' decision to knowingly continue paying Walgreens' reimbursement claims, Defendants reasonably believed that Plaintiffs' PBMs approved of Walgreens' pricing practices.

64.    Because the PBMs are Plaintiffs' express agents and were acting within the scope of their actual or apparent authority, their actions are in law the actions of Plaintiffs.

65.    As a result, based on the actions of their PBM-agents, Plaintiffs' claims are barred in whole or in part by the doctrine of acquiescence.

66.    In addition or in the alternative, the doctrine of acquiescence bars Plaintiffs' claims in whole or in part based on their own actions. As explained in Paragraphs 6 through 12 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs knew or should have known years ago about PSC; its eligibility criteria, terms and conditions, formulary, and lower prices; and Walgreens' U&C price reporting practices, which excluded PSC and other discount club prices.

67.    Indeed, Plaintiffs waited to file their suit until two years after the first of the plaintiffs in the consolidated *BCBSM* Action had filed a nearly identical suit against Defendants.

68.    Plaintiffs also knew that they had, through their PBM-agents, the right to audit Walgreens' reported U&C prices and reimbursement claims if they suspected irregularities or inaccuracies.

69.     For years, Plaintiffs knew about Walgreens' pricing practices but took no actions to object to, challenge, or audit Walgreens' pricing practices or to challenge Walgreens' U&C prices. Instead, they continued to pay Walgreens' reimbursement claims.

70.     Based on Plaintiffs' lack of any objections, challenges, or audits to Walgreens' pricing practices, which they knew excluded PSC and other discount club program prices from U&C, and Plaintiffs' decision to knowingly continue paying Walgreens' reimbursement claims, Defendants reasonably believed that Plaintiffs approved of Walgreens' pricing practices.

71.     Based on their own actions, Plaintiffs' claims are thus barred in whole or in part by the doctrine of acquiescence.

## NINTH AFFIRMATIVE DEFENSE:

### Consent

72.     Plaintiffs' PBMs are Plaintiffs' express agents. The PBMs adjudicate Walgreens' reimbursement claims on Plaintiffs' behalf, pursuant to criteria, rules, and standards dictated by Plaintiffs. The PBMs then remit payment to Walgreens at Plaintiffs' direction, and Plaintiffs are ultimately responsible for reimbursing Walgreens for their insureds' individual prescriptions.

73.     As explained in Paragraph 7 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs' PBMs have known or should have known the bases for their alleged overpayments for many years.

74.     For more than a decade, while acting within the scope of their actual or apparent authority, Plaintiffs' PBMs voluntarily accepted—and, to this day, *continue to voluntarily accept*—U&C prices from Walgreens that exclude PSC and other discount club prices.

75.     In fact, Plaintiffs' PBM-agents have agreed that pharmacies like Walgreens need not report discount club prices as U&C because they are not "cash" prices.

76.     Because the PBMs are Plaintiffs' express agents and were acting within the actual or apparent scope of their authority, their actions are in law the actions of Plaintiffs.

77.     As a result, based on the actions of their PBM-agents, Plaintiffs' claims are barred in whole or in part by the doctrine of consent.

78.     In addition or in the alternative, the doctrine of consent bars Plaintiffs' claims in whole or in part based on their own actions. As explained in Paragraphs 6 through 12 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs knew or should have known years ago about PSC; its eligibility criteria, terms and conditions, formulary, and lower prices; and Walgreens' U&C price reporting practices, which excluded PSC and other discount club prices.

79.     Indeed, Plaintiffs waited to file their suit until two years after the first of the plaintiffs in the consolidated *BCBSM* Action had filed a nearly identical suit against Defendants.

80.     For more than a decade, Plaintiffs voluntarily accepted—and, to this day, ***continue to voluntarily accept***—U&C prices from Walgreens that exclude PSC and other discount club prices.

81.     Based on their own actions, Plaintiffs' claims are thus barred in whole or in part by the doctrine of consent.

**TENTH AFFIRMATIVE DEFENSE:**

**<u>Equitable Estoppel</u>**

82.     Plaintiffs' PBMs are Plaintiffs' express agents. The PBMs adjudicate Walgreens' reimbursement claims on Plaintiffs' behalf, pursuant to criteria, rules, and standards dictated by Plaintiffs. The PBMs then remit payment to Walgreens at Plaintiffs' direction, and Plaintiffs are ultimately responsible for reimbursing Walgreens for their insureds' individual prescriptions.

83.     As explained in Paragraph 7 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs' PBMs have known or should have known the bases for their alleged overpayments for many years.

84.     The contracts between Walgreens and Plaintiffs' PBM-agents required Walgreens to report to the PBMs its cash prices as U&C. The PBMs' interpretation of the U&C definitions in their contracts with Walgreens is a material fact.

85.     Plaintiffs' PBMs have indicated in sworn, public statements that "cash" prices exclude discount club prices available only to members who affirmatively enroll in a club.

86.     Plaintiffs' PBMs have also accepted—and, to this day, ***continue to accept***—U&C prices from Walgreens (through Plaintiffs' PBM-agents) knowing that Walgreens excludes PSC and other discount club prices from its U&C prices.

87.     Because the PBMs are Plaintiffs' express agents and were acting within the actual or apparent scope of their authority, their statements and actions are in law the statements and actions of Plaintiffs.

88.     If Plaintiffs now interpret "cash" prices to include discount club prices available only to members who affirmatively enroll in a club, Plaintiffs knew at the time that their PBM-agents made their sworn, public statements and accepted Walgreens' reimbursement claims that they disagreed with their PBM-agents.

89.     If Plaintiffs now interpret "cash" prices to include discount club prices available only to members who affirmatively enroll in a club, Walgreens did not know that Plaintiffs disagreed with their PBM-agents' earlier sworn, public statements and actions.

90.     Plaintiffs intended or reasonably expected Walgreens to act upon their PBM-agents' public, sworn statements that "cash" prices exclude discount club prices and their acceptance of Walgreens' reimbursement claims.

91.     In reliance on the public, sworn testimony by Plaintiffs' PBMs and their acceptance of Walgreens' price reporting practices, Walgreens excluded and continues to exclude the special club prices offered only to customers who affirmatively enroll in PSC and other third-party discount clubs from its U&C prices.

92.     Walgreens would be prejudiced by its reliance on the public, sworn testimony and actions by Plaintiffs' PBMs if Plaintiffs were now allowed to change their interpretation of "cash" prices.

93.     As a result, based on the statements and actions of their PBM-agents, Plaintiffs' claims are barred in whole or in part by the doctrine of equitable estoppel.

94.     In addition or in the alternative, the doctrine of equitable estoppel bars Plaintiffs' claims in whole or in part based on Plaintiffs' own actions. As explained in Paragraphs 6 through 12 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs knew or should have known years ago about PSC; its eligibility criteria, terms and conditions, formulary, and lower prices; and Walgreens' U&C price reporting practices, which excluded PSC and other discount club prices.

95.     Indeed, Plaintiffs waited to file their suit until two years after the first of the plaintiffs in the consolidated *BCBSM* Action had filed a nearly identical suit against Defendants.

96.     For more than a decade, Plaintiffs accepted—and, to this day, ***continue to accept***—U&C prices from Walgreens (through Plaintiffs' PBM-agents) knowing that Walgreens excludes

PSC and other discount club prices from its U&C prices. Plaintiffs' interpretation of the definition of U&C price is a material fact.

97.     If Plaintiffs now believe that Walgreens should have included discount club prices in its U&C prices, Plaintiffs knew at the time they accepted Walgreens' reimbursement claims (through Plaintiffs' PBM-agents) and approved Walgreens' price reporting practices that their acceptance was untrue.

98.     If Plaintiffs now believe that Walgreens should have included discount club prices in its U&C prices, Walgreens did not know that Plaintiffs' acceptance and approval of its price reporting practices was not true.

99.     Plaintiffs intended or reasonably expected Walgreens to rely upon their acceptance of U&C prices that excluded PSC and other discount club prices and their approval of Walgreens' price reporting practices.

100.     In reliance on the Plaintiffs' acceptance of its U&C prices and approval of its price reporting practices, Walgreens excluded and continues to exclude the special club prices offered only to customers who affirmatively enroll in PSC and other third-party discount clubs from its U&C prices.

101.     Walgreens would be prejudiced by its reliance on Plaintiffs' acceptance of its U&C prices and approval of its price reporting practices if Plaintiffs can take an opposite position in this litigation.

102.     Based on their own actions, Plaintiffs' claims are thus barred in whole or in part by the doctrine of equitable estoppel.

## ELEVENTH AFFIRMATIVE DEFENSE:

### Ratification

103.    Plaintiffs' PBMs are Plaintiffs' express agents. The PBMs adjudicate Walgreens' reimbursement claims on Plaintiffs' behalf, pursuant to criteria, rules, and standards dictated by Plaintiffs. The PBMs then remit payment to Walgreens at Plaintiffs' direction, and Plaintiffs are ultimately responsible for reimbursing Walgreens for their insureds' individual prescriptions.

104.    Plaintiffs' PBMs have knowingly and for years publicly accepted, on Plaintiffs' behalf, U&C prices that do not include discount club prices.

105.    Plaintiffs' PBMs have also publicly interpreted a pharmacy's "cash" price to refer to the retail price paid by anyone walking in the pharmacy's door and paying without insurance; the PBMs do not consider discount club prices, available only to pharmacy customers who affirmatively enroll in the club, to be cash prices.

106.    The PBMs had actual or apparent authority as Plaintiffs' agents to accept and adjudicate reimbursement claims from Walgreens and to interpret the terms in their contracts with Walgreens, including "cash" price, on Plaintiffs' behalf.

107.    But even if the PBMs did not have actual or apparent authority, the PBMs' principals, Plaintiffs, ratified the PBMs' acceptance of U&C prices that exclude PSC and other discount club prices. Plaintiffs knew that the PBMs interpreted "cash" prices to exclude membership club prices, but Plaintiffs continued to pay Walgreens' reimbursement claims as adjudicated by their chosen PBM-agents and never publicly disagreed with or repudiated their PBMs, despite their PBM-agents' public statements and the PBMs' knowing, public acceptance of U&C prices that exclude discount club prices.

108.    In reliance on Plaintiffs' ratification of their PBM-agents' actions, both through their continued payment of Walgreens' reimbursement claims and through their silence in the face

108

of their PBM-agents' public statements and positions that U&C prices properly exclude discount club prices, Walgreens submitted and continues to submit U&C prices that exclude prices offered only to members of PSC and other discount clubs.

109. If Plaintiffs' claims are not barred in whole or in part by agency, actual authority, apparent authority, waiver, acquiescence, consent, or equitable estoppel, Plaintiffs' claims are thus barred in whole or in part by the doctrine of ratification.

## TWELFTH AFFIRMATIVE DEFENSE:

### Laches

110. As explained in Paragraphs 6 through 12 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs knew or should have known years ago about PSC; its eligibility criteria, terms and conditions, formulary, and lower prices; and Walgreens' U&C price reporting practices, which excluded PSC and other discount club prices.

111. Plaintiffs also knew through, among other sources, their PBM-agents, whose knowledge is imputed to Plaintiffs, that Walgreens' U&C prices excluded discount club prices. The PBMs have long known about PSC and other pharmacy and third-party discount clubs, and they have long known that pharmacies did not include PSC and other discount club prices in U&C prices.

112. As explained in Paragraph 6 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs' PBMs act as Plaintiffs' agents while adjudicating reimbursement claims submitted by Walgreens.

113. Among other bases for Plaintiffs' actual or constructive knowledge of their claims, Plaintiffs also knew or should have known the bases for their causes of action, and any purportedly concealed claims accrued, no later than March 2017, when a proposed class of consumer and third-

party payor plaintiffs filed *Forth v. Walgreen Co.*, No. 17-cv-2246, in this District, accusing Walgreens of improperly omitting PSC prices from U&C.

114.    Indeed, Plaintiffs waited to file their suit until two years after the first of the plaintiffs in the consolidated *BCBSM* Action had filed a nearly identical suit against Defendants.

115.    Yet Plaintiffs waited more than a decade after Walgreens introduced PSC and years after consumer and third-party payor plaintiffs filed the nearly identical *Forth* case and *BCBSM* Action to bring their case against Defendants.

116.    During these delays, Walgreens continued to submit U&C prices that exclude PSC and other discount club prices, and Plaintiffs continued—and still, to this day, continue—to pay reimbursements purportedly based on Walgreens` U&C prices.

117.    As a result of Plaintiffs' delays, Defendants have been prejudiced because Plaintiffs' supposed damages continue to accrue.

118.    Plaintiffs' claims are thus barred in whole or in part by the doctrine of laches.

**THIRTEENTH AFFIRMATIVE DEFENSE:**

**Failure to Mitigate Damages**

119.    Plaintiffs' PBMs are Plaintiffs' express agents. The PBMs adjudicate Walgreens' reimbursement claims on Plaintiffs' behalf, pursuant to criteria, rules, and standards dictated by Plaintiffs. The PBMs then remit payment to Walgreens at Plaintiffs' direction, and Plaintiffs are ultimately responsible for reimbursing Walgreens for their insureds' individual prescriptions.

120.    As explained in Paragraph 7 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs' PBMs have known or should have known the bases for their alleged overpayments for many years.

121.    Plaintiffs' PBMs had the right to audit Walgreens' reported U&C prices and reimbursement claims if they suspected irregularities or inaccuracies.

122. Plaintiffs' PBMs could have exercised their audit rights or refused to pay Walgreens based on its purportedly inaccurate U&C prices at any time, including at any time since Walgreens introduced PSC in certain markets in 2006; since the PBMs testified about pharmacy pricing practices beginning in 2016; or since a proposed class of consumer and third-party payor plaintiffs accused Walgreens in this District of submitting inaccurate U&C prices in 2017.

123. Instead, Plaintiffs' PBMs have paid—and continue, to this day, to pay— reimbursements supposedly based on Walgreens' inaccurate U&C prices, causing Plaintiffs' supposed damages to increase.

124. Because the PBMs are Plaintiffs' express agents and were acting within the actual or apparent scope of their authority, their actions are in law the actions of Plaintiffs.

125. As a result, based on the actions of their PBM-agents, Plaintiffs' claims are barred in whole or in part by the PBMs' failure to mitigate damages.

126. In addition or in the alternative, Plaintiffs' claims are also barred in whole or in part by their own failure to mitigate damages. As explained in Paragraphs 6 through 12 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs knew or should have known years ago about PSC; its eligibility criteria, terms and conditions, formulary, and lower prices; and Walgreens' U&C price reporting practices, which excluded PSC and other third-party discount program prices.

127. Indeed, Plaintiffs waited to file their suit until two years after the first of the plaintiffs in the consolidated *BCBSM* Action had filed a nearly identical suit against Defendants.

128. Plaintiffs could have refused to pay Walgreens based on its purportedly inaccurate U&C prices at any time, including at any time since Walgreens introduced PSC in certain markets in 2006; since the PBMs testified about pharmacy pricing practices beginning in 2016; since a

proposed class of consumer and third-party payor plaintiffs accused Walgreens in this District of submitting inaccurate U&C prices in 2017; or since other Blue Cross insurers filed a nearly identical lawsuit against Defendants in March 2020.

129.    Instead, Plaintiffs have paid—and continue, to this day, to pay—reimbursements supposedly based on Walgreens' inaccurate U&C prices, causing their supposed damages to increase.

130.    Plaintiffs' claims are thus barred in whole or in part by Plaintiffs' own failure to mitigate their damages.

## FOURTEENTH AFFIRMATIVE DEFENSE:

### Objectively Reasonable Belief

131.    The contracts between Walgreens and Plaintiffs' PBM-agents required Walgreens to report, as its U&C prices, its "cash" prices.

132.    The nation's largest pharmacies and PBMs all understood "cash" prices to exclude the prices offered only to customers who affirmatively enrolled in discount clubs.

133.    No authoritative guidance or contracts warned Walgreens away from this industry-standard interpretation of the contracts between Walgreens and Plaintiffs' PBM-agents, and Plaintiffs' PBM-agents confirmed this interpretation in other court cases.

134.    Defendants' interpretation of Walgreens' price reporting obligations was objectively reasonable in light of industry standards and authorities.

135.    Plaintiffs' claims are thus barred in whole or in part by Defendants' objectively reasonable belief.

## FIFTEENTH AFFIRMATIVE DEFENSE:

### **Unclean Hands**

136.    Plaintiffs encouraged, assisted, participated in, and otherwise were involved in the allegedly fraudulent price reporting scheme and purported harm to consumers of which Plaintiffs now complain.

137.    As explained in Paragraphs 6 through 12 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs knew or should have known years ago about PSC; its eligibility criteria, terms and conditions, formulary, and lower prices; and Walgreens' U&C price reporting practices, which excluded PSC and other discount club prices.

138.    Indeed, Plaintiffs waited to file their suit until two years after the first of the plaintiffs in the consolidated *BCBSM* Action had filed a nearly identical suit against Defendants.

139.    Plaintiffs also knew through their PBM-agents, whose knowledge is imputed to Plaintiffs, that Walgreens' U&C prices excluded discount club prices. The PBMs have long known about PSC and other pharmacy and third-party discount clubs, and they have long known that pharmacies did not include PSC and other discount club prices in U&C prices.

140.    As explained in Paragraph 6 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs' PBMs act as Plaintiffs' agents while adjudicating reimbursement claims submitted by Walgreens, and those PBMs' knowledge is thus imputed to Plaintiffs.

141.    Plaintiffs' agents, the PBMs, publicly agreed with Walgreens' and other pharmacies' price reporting practices, without any contradiction or correction from Plaintiffs.

142.    Despite their direct and imputed knowledge, and despite their PBMs' public statements condoning pharmacies' price reporting practices, Plaintiffs for years took no action to address the price reporting practices that Plaintiffs now call a fraud perpetrated on consumers.

143.    If consumers were harmed by Walgreens' U&C prices through increased premiums, co-pays, and other costs, as Plaintiffs allege (but which Defendants deny), then Plaintiffs proximately caused the harm. For years, Plaintiffs chose to pay Walgreens' reimbursement claims, despite Plaintiffs fully knowing, directly or through their PBM-agents, that Walgreens' U&C prices exclude PSC and other discount club prices. Then Plaintiffs passed on the alleged increased prescription costs to their insureds.

144.    There is a direct nexus between Plaintiffs' aiding and abetting the alleged fraud scheme and Plaintiffs' request for injunctive relief: among other things, Plaintiffs seek injunctions under consumer fraud statutes for supposed consumer injuries Plaintiffs themselves proximately caused.

145.    Plaintiffs' claims are thus barred in whole or in part by the doctrine of unclean hands related to their involvement in the allegedly fraudulent price reporting scheme and purported harm to consumers.

### SIXTEENTH AFFIRMATIVE DEFENSE:

### In Pari Delicto

146.    Plaintiffs encouraged, assisted, participated in, and otherwise were involved in the allegedly fraudulent price reporting scheme and purported harm to consumers of which Plaintiffs now complain.

147.    As explained in Paragraphs 6 through 12 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs knew or should have known years ago about PSC; its eligibility criteria, terms and conditions, formulary,

and lower prices; and Walgreens' U&C price reporting practices, which excluded PSC and other discount club prices.

148.    Indeed, Plaintiffs waited to file their suit until two years after the first of the plaintiffs in the consolidated *BCBSM* Action had filed a nearly identical suit against Defendants.

149.    Plaintiffs also knew through their PBM-agents, whose knowledge is imputed to Plaintiffs, that Walgreens' U&C prices excluded discount club prices. The PBMs have long known about PSC and other pharmacy and third-party discount clubs, and they have long known that pharmacies did not include PSC and other discount club prices in U&C prices.

150.    As explained in Paragraph 6 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs' PBMs act as Plaintiffs' agents while adjudicating reimbursement claims submitted by Walgreens, and those PBMs' knowledge is thus imputed to Plaintiffs.

151.    Plaintiffs' agents, the PBMs, publicly agreed with Walgreens' and other pharmacies' price reporting practices, without any contradiction or correction from Plaintiffs.

152.    Despite their direct and imputed knowledge, and despite their PBMs' public statements condoning pharmacies' price reporting practices, Plaintiffs for years took no action to address the price reporting practices that Plaintiffs now call a fraud perpetrated on consumers.

153.    If consumers were harmed by Walgreens U&C prices through increased premiums, co-pays, and other costs, as Plaintiffs allege (but which Walgreens denies), then Plaintiffs proximately caused the harm. For years, Plaintiffs chose to pay Walgreens' reimbursement claims, despite Plaintiffs fully knowing, directly or through their PBM-agents, that Walgreens' U&C prices exclude PSC and other discount club prices. Then Plaintiffs passed on the alleged increased prescription costs to their insureds.

154.    There is a direct nexus between Plaintiffs' aiding and abetting the alleged fraud scheme and Plaintiffs' request for legal relief: among other things, Plaintiffs seek significant actual and punitive damages under consumer fraud statutes for supposed consumer injuries Plaintiffs themselves proximately caused.

155.    Plaintiffs' claims are thus barred in whole or in part by the doctrine of in pari delicto related to their involvement in the allegedly fraudulent price reporting scheme and purported harm to consumers.

### SEVENTEENTH AFFIRMATIVE DEFENSE:

### <u>Aiding and Abetting</u>

156.    Plaintiffs aided and abetted the allegedly fraudulent price reporting scheme and purported harm to consumers of which Plaintiffs now complain.

157.    As explained in Paragraphs 6 through 12 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs knew or should have known years ago about PSC; its eligibility criteria, terms and conditions, formulary, and lower prices; and Walgreens' U&C price reporting practices, which excluded PSC and other discount club prices.

158.    Indeed, Plaintiffs waited to file their suit until two years after the first of the plaintiffs in the consolidated *BCBSM* Action had filed a nearly identical suit against Defendants.

159.    Plaintiffs also knew through their PBM-agents, whose knowledge is imputed to Plaintiffs, that Walgreens' U&C prices excluded discount club prices. The PBMs have long known about PSC and other pharmacy and third-party discount clubs, and they have long known that pharmacies did not include PSC and other discount club prices in U&C prices.

160.    As explained in Paragraph 6 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs' PBMs act as Plaintiffs'

agents while adjudicating reimbursement claims submitted by Walgreens, and those PBMs' knowledge is thus imputed to Plaintiffs.

161.    Plaintiffs' agents, the PBMs, publicly agreed with Walgreens' and other pharmacies' price reporting practices, without any contradiction or correction from Plaintiffs.

162.    Despite their direct and imputed knowledge, and despite their PBMs' public statements condoning pharmacies' price reporting practices, Plaintiffs for years took no action to address the price reporting practices that Plaintiffs now call a fraud perpetrated on consumers.

163.    If consumers were harmed by Walgreens' U&C prices through increased premiums, co-pays, and other costs, as Plaintiffs allege (but which Walgreens denies), then Plaintiffs proximately caused the harm. For years, Plaintiffs chose to pay Walgreens' reimbursement claims, despite Plaintiffs fully knowing, directly or through their PBM-agents, that Walgreens' U&C prices exclude PSC and other discount club prices. Then Plaintiffs passed on the alleged increased prescription costs to their insureds.

164.    Plaintiffs' claims are thus barred in whole or in part by the doctrine of aiding and abetting the purported fraud scheme.

### EIGHTEENTH AFFIRMATIVE DEFENSE:

### <u>Comparative Fault</u>

165.    As explained in Paragraphs 9 through 12 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs knew or should have known years ago about PSC; its eligibility criteria, terms and conditions, formulary, and lower prices; and Walgreens' U&C price reporting practices, which excluded PSC and other discount club prices.

166.    Indeed, Plaintiffs waited to file their suit until two years after the first of the plaintiffs in the consolidated *BCBSM* Action had filed a nearly identical suit against Defendants.

167. If Plaintiffs truly did not know that Walgreens excluded PSC prices from U&C prices or the terms and conditions of PSC, it is because Plaintiffs unreasonably buried their heads in the sand and negligently failed to find out more.

168. For years, Plaintiffs chose to pay Walgreens' reimbursement claims without investigating Walgreens' pricing practices or asking for more information about PSC, despite Plaintiffs fully knowing that Walgreens' U&C prices exclude PSC and other discount club prices. Then Plaintiffs passed on the alleged increased prescription costs to their insureds.

169. As a result, if consumers or Plaintiffs were harmed by Walgreens U&C prices through increased premiums, co-pays, and other costs, as Plaintiffs allege (but which Walgreens denies), then Plaintiffs' negligence proximately caused the harm.

170. Plaintiffs' claims are thus barred in whole or in part by the doctrine of comparative negligence.

## NINETEENTH AFFIRMATIVE DEFENSE:

### Due Process

171. To the extent Plaintiffs seek civil or statutory penalties or punitive damages, such claims violate the Due Process and Excessive Fines Clause recited in or incorporated into the Fifth, Eighth, and Fourteenth Amendments to the United States Constitution or the analogous state constitutional provisions.

172. Plaintiffs' claims are thus barred in whole or in part by the Due Process and Excessive Fines Clauses in the United States Constitution or analogous state constitutional provisions.

## TWENTIETH AFFIRMATIVE DEFENSE:

### Satisfaction

173.     As explained in Paragraph 6 of these Affirmative Defenses, which Defendants incorporate by reference and repeat in this Affirmative Defense, Plaintiffs' PBMs act as Plaintiffs' agents while adjudicating reimbursement claims and entering into contracts with Walgreens on Plaintiffs' behalf.

174.     In certain of those contracts, Walgreens and Plaintiffs' PBMs, acting within the scope of their actual or apparent authority as Plaintiffs' agents, have agreed to a reconciliation formula. If the PBMs pay, on behalf of Plaintiffs, more than a pre-negotiated rate for a class of prescription drugs over a certain period, Walgreens refunds the difference. If the PBMs pay, on behalf of Plaintiffs, less than a pre-negotiated rate for a class of prescription drugs over a certain period, Plaintiffs' PBMs refund the difference.

175.     Walgreens and Plaintiffs' PBMs, acting within the scope of their actual or apparent authority as Plaintiffs' agents, agreed to the reconciliation formula to resolve disputes about reimbursements and with a shared mutual intent to compromise.

176.     The reconciliation formula is included in certain of the contracts between Walgreens and Plaintiffs' PBMs, which are validly executed and supported by adequate consideration.

177.     To the extent Walgreens' U&C price reporting has caused Plaintiffs, through their PBM-agents, to overpay (which Walgreens denies), Walgreens has offered, and Plaintiffs' PBM-agents have accepted, reimbursements calculated according to the reconciliation formula.

178.     Because the PBMs are Plaintiffs' express agents and were acting within the scope of their actual or apparent authority, their actions are in law the actions of Plaintiffs.

179.     Plaintiffs' claims are thus barred in whole or in part by the doctrine of satisfaction.

## <u>JURY TRIAL DEMAND</u>

Defendants demand a jury trial on all issues so triable.

Dated: January 12, 2023

Respectfully submitted,

/s/ *Jeffrey J. Bushofsky*
Jeffrey J. Bushofsky
Laura G. Hoey
Timothy R. Farrell
Charles D. Zagnoli
**ROPES & GRAY LLP**
191 North Wacker Drive
32nd Floor
Chicago, Illinois 60606
Tel: (312) 845-1200
Fax: (312) 845-5522
Jeffrey.Bushofsky@ropesgray.com
Laura.Hoey@ropesgray.com
Timothy.Farrell@ropesgray.com
Charles.Zagnoli@ropesgray.com

*Attorneys for Defendants Walgreen Co. &*
*Walgreens Boots Alliance, Inc.*

## CERTIFICATE OF SERVICE

I, Charles D. Zagnoli, hereby certify that the foregoing **Defendants' Answer and Affirmative Defenses to the *CareFirst* Plaintiffs' Complaint** was electronically filed on January 12, 2023, and will be served electronically via the Court's ECF Notice system upon the registered parties of record.

/s/ *Charles D. Zagnoli*

Charles D. Zagnoli
**ROPES & GRAY LLP**
191 North Wacker Drive
32nd Floor
Chicago, Illinois 60606
Tel: (312) 845-1200
Fax: (312) 845-5522
Charles.Zagnoli@ropesgray.com

*Attorney for Defendants Walgreen Co. &*
*Walgreens Boots Alliance, Inc.*